[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

**FILED**

**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
**November 20, 2003**
**THOMAS K. KAHN**
**CLERK**

No. 01-16485
_____

D. C. Docket No. 99-01259 CV-DMM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

$242,484.00,

Defendant,

DEBORAH STANFORD, individually and as
President, Director, and Stockholder of
Mike's Import & Exports, U.S.A., a
Florida corporation,

Claimant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(November 20, 2003)**

ON PETITION FOR REHEARING

Before EDMONDSON, Chief Judge, ANDERSON, Circuit Judge, and POGUE[*],
Judge.

_____

[*] Honorable Donald C. Pogue, Judge, United States Court of International Trade, sitting
by designation.

EDMONDSON, Chief Judge:

This case comes before us on a petition for rehearing by appellee, the United States of America. We deny the petition, but we substitute this opinion for the previous opinions which we have already withdrawn.

This appeal arises out of a civil forfeiture action applying 21 U.S.C. § 881(a)(6) (1994) -- the version in effect before the 2000 amendments -- which provides for the forfeiture of money linked to drug crimes.[1] The district court ordered the forfeiture of $242,484.00 seized from the claimant, Deborah Stanford. Stanford argues that the government lacked probable cause to support forfeiture of the defendant currency.[2] The district court saw probable cause as "admittedly a close question." Because we conclude the circumstances are insufficient to

---

[1] 21 U.S.C. § 881(a) (1994) provides:
The following shall be subject to forfeiture to the United States and no property right shall exist in them: . . . (6) All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter [dealing with control of drugs].
(emphasis added)

[2] Because the forfeiture complaint was filed on 30 April 1999, the heightened burden of proof established by the Civil Asset Forfeiture Reform Act of 2000 does not apply to this case. See United States v. Cleckler, 270 F.3d 1331, 1334 n.2 (11th Cir. 2001) ("[T]he Civil Asset Forfeiture Reform Act of 2000 . . . became effective for any forfeiture commenced on or after 120 days from the enactment date of 25 April 2000.").

2

establish the needed probable cause, we reverse the forfeiture order.[3]

## BACKGROUND

Deborah Stanford lives in Opa Locka, Miami-Dade County, Florida. She is a shareholder and president of Mike's Import & Export U.S.A., Inc. ("Mike's").

In December 1998, Stanford purchased for $93 in cash a round-trip ticket from Miami to New York City. She says that she was in New York City regarding a court case from a car accident she had approximately ten years prior. While in New York, she says that she was contacted by her brother and told to pick up some money for their business, Mike's. The cash money was delivered to her by people whom she says she did not know. One package was wrapped in black plastic and

---

[3] In addition, Stanford argues the district court erred by saying that Mike's Import & Export U.S.A., Inc. lacked standing to contest the forfeiture. Because Mike's filed no claim, the district court correctly determined that Mike's lacked standing. Because we conclude that the government cannot establish probable cause, we decline to address the remaining issues on this appeal.

Stanford also argues that the stop conducted at the Miami Airport was an unreasonable seizure in violation of the Fourth Amendment and that, therefore, the fruits of the seizure should have been suppressed at the forfeiture hearing. "A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them." Lyng v. Northwest Indian Cemetery Protective Ass'n, 108 S.Ct. 1319, 1323 (1988). Because we conclude that the government cannot establish probable cause even with the evidence obtained from the stop, we avoid this Fourth Amendment issue. For the same reason, we say nothing about whether the drawn-out interrogation (the evidence in the record suggests the time might have been as long as three hours) of Stanford in the airport's DEA office was itself unreasonable and constituted an unconstitutional seizure.

3

the other in a Christmas wrapping. Each package was enclosed in what the district court described as "cellophane-type material."

Stanford was originally scheduled to return to Miami on 12 December; but after failing to show up on 12 December, she twice changed her return date. Then, on 14 December, Stanford flew from New York to Miami. Airport personnel at John F. Kennedy International Airport ("JFK") questioned her about the packages. After questioning, Stanford boarded her flight, but an airport worker notified the Drug Enforcement Administration ("DEA") that a woman carrying a large amount of cash was traveling to Miami. The airport worker also reported to the DEA that the woman had become "belligerent" when questioned about the money.

Several Miami DEA agents went to the gate where Stanford's flight was scheduled to arrive. Agents Kenneth Miles and John Johnson saw Stanford soon after she came off the plane. The agents approached her and identified themselves as DEA agents.

At Agent Miles's request, Stanford gave him her ticket and identification. Both the ticket and identification were in her own name: Deborah Stanford. The agents verified her name and returned the items. Agent Miles asked her if she was carrying contraband or money, and she said she was carrying about $200,000 cash in her backpack.

4

Agent Miles, with Stanford's permission, looked into the backpack and found two packages, one wrapped in black plastic and the other in Christmas wrapping. Each package contained large bundles of cash in various denominations. The bundles were not of uniform size or amounts and did not bear the binding of a bank or financial institution. The Agents asked Stanford to accompany them to the DEA's airport office, and she agreed.

At the office, Agent Miles asked Stanford why she was in New York. She said she was there because of a court case; but Agent Miles stated that, later during the interrogation,[4] Stanford said that she was in New York to pick up the money in question. Stanford could not identify who gave her the cash other than to say that, while in New York, she was called by her brother who told her to meet some people to pick up money for Mike's. Stanford also could not, or would not, identify where she stayed in New York. She did not produce documentation connecting the currency to Mike's. When asked for the total amount of the cash, Stanford said that one package contained $79,900 and the other $162,750, a total of $242,650. But an official count of the money at the bank found the total to be $242,484.

During the airport interrogation, "Rambo," a narcotics-detection dog, was

_____

[4] The district court said nothing about how long the interrogation lasted.

5

brought into the office. Stanford's backpack was placed in a hallway with other packages of similar size and shape. Rambo alerted to Stanford's backpack. Thereafter, Stanford and the DEA supervisor -- who had just arrived -- had a heated exchange, and Stanford left to contact her attorney.

After the seizure on 14 December 1998, the DEA performed an investigation into the surrounding circumstances, including a check into Stanford's trip to New York and the business history of Mike's.[5] According to the district court's order, no proceedings were brought against Stanford, nor was she charged with a crime in connection with these events. The 2001 order does not suggest that anyone has ever been charged with a crime or been the subject of other proceedings arising from these events.

DISCUSSION

Stanford argues that the government has made no showing -- that rises above suspicion -- of a connection between the money and controlled substances.

---

[5]A computer query that was run during the interrogation generated a report not entered into the record that allegedly showed that Mike's was a possible alias for "Mike's Import and Export, NV," which the DEA suspected of possible money laundering. The district court did not find this report credible because the query -- that is, the question underlying the search -- was unknown, the suspected money laundering corporation did not have the exact name as Mike's, and the information entered in the computer files is at times "'raw intelligence' information, not always thoroughly corroborated."

In reviewing a determination of probable cause, we engage in a two-part analysis. Ornelas v. United States, 116 S.Ct. 1657, 1662 (1996). First, we review the district court's "findings of historical fact only for clear error." Id. at 1663; see also Fed. R. Civ. P. 52(a). In reviewing the findings for clear error, we "consider the evidence, and such reasonable inferences as may be drawn therefrom, in the light most favorable to the appellees." Wheeler v. Holland, 218 F.2d 482, 483 (5th Cir. 1955). Second, we review de novo "whether the rule of law as applied to the established facts is or is not violated." Id. at 1662; see also Sunderland Marine Mut. Ins. Co. v. Weeks Marine Constr. Co., 338 F.3d 1276, 1277 (11th Cir. 2003). In determining whether the district court properly applied the law, we construe all facts in favor of the prevailing party. See, e.g., United States v. Goddard, 312 F.3d 1360, 1362 (11th Cir. 2002).

By facts, we, as an appellate court, mean only the factual findings that the district court made. Those findings may be express or implied. See Barber v. Int'l Bhd. of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers & Helpers, Dist. Lodge No. 57, 778 F.2d 750, 756 (11th Cir. 1985). But we will infer findings of fact only where the district court distinctly seems to have intended to imply such facts. See, e.g., Triangle Conduit & Cable Co. v. FTC, 168 F.2d 175, 179 (7th Cir. 1948) (inferring fact where no one could doubt that the fact was implied).

7

Although we construe all factual findings in favor of the prevailing party, we do not go beyond the district court's findings. Once we have reviewed the findings for clear error, we consider only whether the findings -- construed in favor of the prevailing party -- support the judgment.[6]

We will not engage in finding new facts to support or to diminish the district court's legal conclusions. See United States v. Barnette, 10 F.3d 1553, 1556 (11th Cir. 1994) (stating that "an appellate court does not find facts"). In this case, if evidence is in the record to support possible additional factual findings by an appropriate fact finder, we are inclined to think that "[i]t is not within the

---

[6] We do note that in reviewing district court rulings for which no factual findings are required by the Federal Rules of Civil Procedure we review all evidence in the light most favorable to the party prevailing below -- but only if *no factual findings are made*. See, e.g., United States v. Franklin, 323 F.3d 1298, 1300 (11th Cir. 2003), petition for cert. filed, (9 June 2003) (No. 02-11200) (construing the evidence in the light most favorable to the prevailing party where "the district court denied [a motion] without expressly making factual findings"); United States v. Smith, 543 F.2d 1141, 1145 & n.11 (5th Cir. 1976) (construing the evidence in the light most favorable to the party prevailing below on a motion to suppress the evidence *because* the district court did not enter findings of fact).

Fed. R. Civ. P. 52(a) requires that "a district court's findings of fact and conclusions of law be sufficiently detailed that we can ascertain the factual and legal basis for the district court's ultimate conclusion." Johnson v. Hamrick, 196 F.3d 1216, 1219 (11th Cir. 1999) (internal citations and quotations omitted). If a district court has complied with Rule 52(a), we adhere to the rule by reviewing the district court's findings for clear error and considering only those findings in determining whether the legal conclusion drawn from those facts satisfies the rule of law. If the district court has failed to comply with Rule 52(a), we may remand for additional findings, or we may decide the appeal if "a complete understanding of the issues may be had without the aid of separate findings." Armstrong v. Collier, 536 F.2d 72, 77 (5th Cir. 1976). In this case, the district court properly complied with Rule 52(a). Therefore, we consider only the findings made by the district court.

competence of this Court to make such findings."[7] Deering-Milliken & Co. v. Modern-Aire of Hollywood, Inc., 231 F.2d 623, 627 (9th Cir. 1955).  We remember that there "is no excuse for the Court of Appeals . . . [to] engage in impermissible appellate factfinding." Amadeo v. Zant, 108 S.Ct. 1771, 1780 (1988).

To prevail in a civil forfeiture case, the government must establish "probable cause for belief that a substantial connection exists between the property to be forfeited and the criminal activity defined by the statute." United States v. $4,255,625.39, 762 F.2d 895, 903 (11th Cir. 1985) (quoting United States v. $364,960.00, 661 F.2d 319, 323 (5th Cir. Unit B 1981) (emphasis omitted)).  The probable-cause standard demands less evidence than the preponderance-of-the-evidence standard. But the probable-cause standard demands more powerful evidence than would allow someone to suspect -- even reasonably to suspect -- that a substantial connection exists between the pertinent property and a drug crime. Probable cause exists when "the facts warrant a reasonably cautious person" to

---

[7]For example, if in a case the government attempts to establish 24 facts by evidence (especially oral testimony at a hearing where demeanor can be observed by the district judge) and the district judge finds 19 of these facts have been established but is silent on the other 5, we do not believe that an appellate court should simply find for itself the other 5 facts to justify affirming the district court judgment.  In our view, the practice trivializes the fact findings that were made and shows too low a regard for the district judge as the fact finder and credibility determiner.  We doubt that our case law allows such appellate fact finding, but we are confident our law does not compel such appellate fact finding.

9

believe that the item to be forfeited is substantially related to drug crime.[8] See, e.g., United States v. Armstrong, 722 F.2d 681, 686 (11th Cir. 1984) (discussing probable cause in the context of a seizure); United States v. Four Parcels of Real Property, 941 F.2d 1428, 1440 (11th Cir. 1991) (en banc) (stating that the standard for probable cause in forfeiture cases is "the same standard used to determine the legality of arrests, searches, and seizures in criminal law") (internal quotations and citations omitted). In this case, we stress that, because the forfeiture is pursuant to 21 U.S.C. § 881(a)(6), not just any criminal activity will support the forfeiture: the form of criminal wrongdoing must involve "the exchange of a controlled substance." Id. at 1440.

"[T]he probable cause inquiry is a flexible one in which the court must consider the 'totality of the circumstances.'" United States v. $121,100.00, 999

---

[8] In forfeiture cases, we have sometimes used these words: "'Probable cause' refers to 'reasonable ground for belief of guilt, supported by less than prima facie proof but more than mere suspicion.'" United States v. $4,255,625.39, 762 F.2d 895, 903 (11th Cir. 1985) (quoting United States v. One 1978 Chevrolet Impala, 614 F.2d 983, 984 (5th Cir. 1980)). We do not know what "prima facie proof" means in this context. "Prima facie proof" is that proof "[s]ufficient to establish a fact or raise a presumption unless disproved or rebutted." Black's Law Dictionary 1209 (7th ed. 1999). In a forfeiture case, probable cause *is* "prima facie proof" because the statute allows the government to prevail upon an unrebutted showing of probable cause. As one judge has noted, "[p]resumably, courts stating that the Government need not present 'prima facie proof' to prevail in a forfeiture proceeding mean that the evidence need not meet the standard of proof known as 'preponderance of the evidence,' i.e., that the fact to be proved is more likely so than not so." United States v. Banco Cafetero Panama, 797 F.2d 1154, 1160 n.7 (2d Cir. 1986). But such usage of the term "prima facie proof" seems to be an unfortunate misuse of legal terminology with no significance.

10

F.2d 1503, 1506 (11th Cir. 1993). "In evaluating the evidence of proceeds traceable to drug transactions, we have eschewed clinical detachment and endorsed a common sense view to the realities of normal life . . . ." United States v. Carrell, 252 F.3d 1193, 1201 (11th Cir. 2001) (internal quotations and citations omitted).

As we have said, when reviewing a forfeiture order, we accept the district court's fact findings unless clearly erroneous. United States v. Land, 221 F.3d 1194, 1199 (11th Cir. 2000). In this case, we see no clear error in the district court's factual findings. But in this Circuit one thing is clear: whether the facts as found by the district court are sufficient to establish probable cause is a question of law which we review de novo.[9] See $121,100.00, 999 F.2d at 1507.

_____

[9] Our probable-cause inquiry, in this case, is limited to the factual findings drawn from the evidence put forth by the government in support of probable cause. At the hearing, the government offered its evidence in support of probable cause. When the government rested, Stanford rested on the issue of probable cause and did not offer evidence. The district court then tentatively determined that probable cause had been established. Stanford proceeded to offer evidence on the issues of legitimate source and innocent ownership. "When a claimant presents no evidence to contradict the government's evidence of probable cause, the scope of review on appeal is whether the *government's evidence* established probable cause." United States v. 900 Rio Vista Blvd., 803 F.2d 625, 629-630 (11th Cir. 1986) (emphasis added). Because Stanford did not testify during the probable-cause portion of the hearing, we do not consider fact findings based upon Stanford's forfeiture-hearing testimony when we review whether the government established probable cause.

Some circuits require the government to establish probable cause only using evidence obtained before the filing of the forfeiture complaint. United States v. $191,910, 16 F.3d 1051, 1071 (9th Cir. 1994), superseded by statute as stated in United States v. $80,180.00, 303 F.3d 1182 (9th Cir. 2002); United States v. 255 Broadway, 9 F.3d 1000, 1003 (1st Cir. 1993); United States v. $91,960.00, 897 F.2d 1457, 1462 (8th Cir. 1990). While we today do not limit the government's probable-cause case to evidence obtained before the initiation of the forfeiture proceedings (because the question was not briefed and argued), the government must establish probable cause before the probable-cause portion of the hearing is concluded. Once the claimant

The district court relied on these circumstances to support its finding of probable cause: (1) "the quantity of cash . . . and its physical condition"; (2) "the route and circumstances surrounding Ms. Stanford's travel"; (3) "Ms. Stanford's lack of knowledge concerning the circumstances surrounding her trip to New York and the receipt of this money, including her inability to identify from whom she received it"; (4) "that Ms. Stanford twice was a 'no show' for her scheduled departure from New York to Miami"; and (5) a narcotics-dog alert on the cash.[10]

has established standing, if the government cannot establish its statutorily created right to the property by showing probable cause, the claimant's ability or inability to prove their right to the property is immaterial. See United States v. $557,933.89, 287 F.3d 66, 77 (2d Cir. 2002) ("It must be remembered that what is adjudicated in a judicial civil forfeiture proceeding is the *government's* right to the property, not the claimant's. . . . [I]f the government fails [to establish its right to forfeiture], the property is not forfeited -- regardless of whether or not the claimant turns out to be the actual owner of the property.").

[10] The government also asks us to consider the Narcotics and Dangerous Drug Information System (NADDIS) report (indicating that a Florida business called Mike's might be a front for money laundering) and Stanford's supposed changing of her story while talking to the DEA. We can count neither. The district court did not find the NADDIS report to be credible, but rather found it to be of "negligible value." We understand negligible to mean "so small, trifling, or unimportant that it may safely be neglected or disregarded." Random House Dictionary of the English Language 1286 (2d ed. 1987). Under Fed. R. Civ. P. 52, we must abide by this credibility finding because it is not clearly erroneous.

Nor will we count the government's claim that Stanford changed her story. We acknowledge that we must accept a district court's definite (although implicit) finding unless that finding is clearly erroneous. E.g., Employers Cas. Co. v. Employers Commercial Union Ins. Co., 632 F.2d 1215, 1219 (5th Cir. 1980). But in this case, we do not believe that the district court made even an implicit finding that Stanford changed her story. Despite making detailed findings of fact, the district court never said that Stanford changed her story, never said that Stanford lied to the Agents, and -- this point is important -- *never discussed this allegation of story changing when making its probable-cause determination.* The only thing the district court said about the alleged changed story was that "[a]t trial, Agent Miles stated that at this point, Ms. Stanford had changed her story concerning the source of the money."

In the context of the district court order, this statement by the court is only a finding of what Agent Miles said at the hearing; it is not a finding of the truthfulness, accuracy, sincerity,

12

None of these things standing alone is sufficient to establish the needed probable

cause. Always keeping in mind that probable cause is a totality-of-the-

circumstances test, we will consider each element in turn to determine how much

weight, if any, should be assessed to it as part of the whole. See United States v.

$36,634.00, 103 F.3d 1048, 1054 (1st Cir. 1997).[11] In conducting this analysis, we

or reliability of what Agent Miles said; put differently, it is not a finding that Stanford changed her story. Mere recitation of testimony is not a finding of fact on the truthfulness of the testimony. See United States v. Butler, 41 F.3d 1435, 1447 (11th Cir. 1995) ("A contention . . . does not constitute a finding."); Republic Tech. Fund, Inc. v. Lionel Corp., 483 F.2d 540, 548 n.7 (2d Cir. 1973) ("[M]ere repetition of testimony is not a finding.").

In the order, the district court had no difficulty in saying -- that is, finding as historical facts -- things like "Ms. Stanford initially refused," "Ms. Stanford said," "Ms. Stanford replied," "Ms. Stanford consented," or "Ms. Stanford denied" -- even though the court had only the testimony of the government witnesses upon which to rely. But in this instance, the court wrote that Agent Miles "stated" that Stanford changed her story. In the context of the district court's order, this observation by the district court is of a different kind altogether. When a district court, drawing on testimony, consistently and unequivocally writes that a person took action and then abruptly stops to write that "the witness states" that the person took some other action, we cannot regard the referenced-to witness's statement as a finding that the person did indeed take such other action. And, we repeat, the district court never mentions Stanford's supposed change of story when it analyzes the record for probable cause.

The district judge -- foreseeing an appeal -- drafted his order carefully, telling the parties that "one of the reasons I'm going to . . . put [the order] in writing, is so that the Eleventh Circuit gets a chance to deal with it." In the light of that statement and the language of the order, we believe that if the district judge had truly found that Stanford changed her story, he would have made that finding clear to this Court.

By the way, the government at the hearing offered no transcript or tape recording of the agents' questioning of Stanford at the airport.

Also, even if Stanford did change her story, the change in story does not implicate drugs particularly.

[11] We cannot possibly evaluate the totality of the circumstances without first understanding those circumstances. Then, we estimate how strongly they each indicate a connection to drug crime in the case at hand. We accept that in some cases the whole might be greater than the sum of its parts. But to determine whether the whole exceeds the threshold of probable cause, we first look at the parts. See United States v. $67,220.00, 957 F.2d 280, 284-86 (6th Cir. 1992) (examining each piece of evidence individually for probative value and then

recognize that probable cause is a fact-driven, case-by-case inquiry. Kinds of facts that may be suspicious in a particular case may not be suspicious in a different case involving different circumstances.

Carrying a large amount of cash can indicate criminal activity. But it is not illegal to transport money this way.[12] A large amount of cash does not -- alone -- satisfy the government's burden to show probable cause. $121,100.00, 999 F.2d at 1507. In addition, to support a forfeiture under section 881, there must be a link to criminal activity which must be a narcotics transaction.

The manner in which this currency was bundled indicates that it did not come directly from a bank; and we suppose it could suggest some kind of illegal source.[13] But, even giving the government the benefit of an inference on illegal source, the way this currency was bundled does not indicate a connection *specifically* to drugs.[14]

---

considering the evidence in aggregation).

[12] In saying this, we do not mean to imply that illegal conduct on the part of the claimant is somehow the standard for forfeiture. We merely observe that this conduct, while possibly suspicious, is perfectly legal and within Ms. Stanford's rights. For section 881(a)(6), probable cause cannot be interpreted so broadly as inherently to penalize legal conduct.

[13] The district court did not indicate that the bundling signalled a connection to drugs. We look to precedent to determine *the weight* to give to this manner of bundling.

[14] Stanford's money was bundled in non-uniform stacks -- that is, the same sum was not in each stack. This manner of bundling is atypical from that normally used by couriers of drug currency. See, e.g., United States v. $321,470.00, 874 F.2d 298, 302 (5th Cir. 1989) (noting

14

The evidence presented in support of probable cause need not "point to drugs to the exclusion of all other theories." Id. at 1508. But under section 881, the probable cause must be probable cause to believe a specific thing. Under section 881(a)(6), the government must evidence a connection -- beyond proof that a drug crime may be one of several similarly likely possibilities -- between the seized money and an illegal narcotics transaction. The way the money here was bundled, while possibly creating some suggestion of some criminal activity, assists hardly at all in making a more specific connection to drug crime. Based on the facts, as found, it is about as likely that the money -- *if* not legitimate -- was the result of extortion, gun running, bank robbery, illegal gambling, simple tax evasion, exporting stolen goods, or any number of other possibilities.[15] Section 881 does not authorize civil forfeiture on the basis of probable cause of just *any* crime; it only authorizes forfeiture on the basis of a drug crime.

That the currency was wrapped to conceal its presence adds almost nothing. We accept that anyone traveling with a large amount of currency would try to conceal it for safety reasons. See $36,634.00, 103 F.3d at 1055 n.8 ("There is little

---

government testimony that "[i]n narcotics, money is bundled in $1,000 and $5,000 bundles primarily").

[15] We must recall that in South Florida there are crimes -- other than drug crimes -- involving substantial amounts of money.

15

significance in the fact that [claimant's money] was 'concealed' . . . . Few people

carry money, especially large sums, in any way other than 'concealed.'"). As

Agent Johnson testified, someone identified as having a large amount of currency

could be robbed or killed. Stanford never hid the fact that she was carrying

currency from the law officers; when asked, she told the DEA agents that she was

carrying cash. Had Stanford actively attempted to hide the money from the

authorities, the wrapping might be of more influence. But in this case, we cannot

say that the currency being wrapped to conceal its presence indicates a connection

to narcotics transactions as required by the statute.[16] While we recognize that the

---

[16] In a parenthetical to one citation in their Appellee's brief, the government states that cellophane is commonly used by drug organizations to hide the smell of drugs on currency. Never was this argument mentioned at trial or mentioned otherwise on appeal. When Agent Johnson in district court was asked to explain the significance of how the currency was wrapped, he only said that it was wrapped to prevent the currency from being readily visually recognized as currency. Although neither party argued the significance of the wrapping as it relates to the odor of drugs (and this omission, as a matter of appellate practice, is enough to justify our giving the matter no importance), we have looked to prior cases to determine if any possible significance exists.

We know of only two published circuit court forfeiture cases that have said cellophane-wrapped currency indicates a connection to drug activity: United States v. $129,727.00, 129 F.3d 486, 490 (9th Cir. 1997) (currency wrapped with plastic wrap *and fabric-softener sheets to conceal odor*); and United States v. $42,500.00, 283 F.3d 977, 982 (9th Cir. 2002) (currency wrapped in cellophane). $129,727.00 presents an obviously different circumstance -- with clear evidence of an attempt to mask the smell (the dryer sheets are not needed to bundle the money) -- than this case. The $129,727.00 court said, "The nexus between fabric softener and drug trafficking is recognized to be of great probative value." $129,727.00, 129 F.3d at 491. $129,727.00 said nothing about a link between cellophane and drug trafficking when dryer sheets were not involved. Id. Although $42,500.00 says nothing about dryer sheets, the only case it cited in support of the position that cellophane was used to conceal drug odor was $129,727.00, a dryer-sheet case. $42,500.00, 283 F.3d at 982.

In the case before us, the district court did *not* find that the currency was wrapped in cellophane and instead described the wrappings as "cellophane–type material," which was

16

manner of concealment and transportation, taken together, is probative and may raise suspicion about the source of the cash, we cannot ignore the weakness of the circumstantial evidence at issue here.

Travel from New York to Miami is an appropriate element to consider. Miami is a known center for drug smuggling and money laundering. $4,255,625.39, 762 F.2d at 904. New York is a money source city for drug activity. United States v. $129,727.00, 129 F.3d 486, 490 (9th Cir. 1997). Travel between source cities is circumstantial evidence of a possible connection between the money seized and narcotics transactions.[17] Combined with other circumstantial

_____

consistent with some of the testimony in the district court. The government's photographs purporting to show how the currency was wrapped do not show cellophane: "a transparent, paper-like product of viscose, impervious to moisture, germs, etc., used to wrap and package food, tobacco, etc." Random House Dictionary of the English Language 334 (2d ed. 1987). The government here offered no evidence -- and, more important, *the district court did not find* -- that this "cellophane-type" wrapping has all the properties of cellophane or is used to mask (or even is capable of masking) the smell of drugs. Without the use of dryer sheets, or similar devices, we cannot say that the wrappings here indicated an active attempt to conceal the smell of drugs.

Even if the wrapping factor had been fairly presented and argued, it would hardly count for much. Stanford had to carry her currency somehow.

[17] At one time, travel between so called "source cities" might have been more compelling. But, as the number of "source cities" has increased, their value to our probable-cause analysis has decreased. Agent Johnson testified that, in addition to New York and Miami, Washington, D.C., Detroit, Chicago, San Antonio, Los Angeles, San Francisco, Seattle, Tacoma, and Tampa are all considered "source cities." Our review of other cases adds Boston, Cleveland, Dallas, El Paso, Phoenix, San Diego, Schenectady, Tucson, Wilmington (North Carolina), the whole state of California, and the entire "upper Midwest" to the list of locations that the DEA claims should increase our suspicion of a person's involvement with drug activity. At least one federal judge has asked whether all cities with international airports are "source cities." United States v. $141,770.00, 157 F.3d 600, 608 (8th Cir. 1998) (Davis, J., concurring in part and dissenting in part). Another has pointed out that nearly every American city with any significant

evidence, travel between these cities may be sufficient to establish probable cause. Id. But when combined with only other weak circumstantial evidence (as here), the "source city" element fails to draw a substantial connection to an illegal narcotics transaction.

We consider that Stanford purchased her ticket with cash. Business travelers often purchase airline tickets with credit cards or checks while drug couriers often do not.[18] And this circumstance is an appropriate consideration when evaluating probable cause in the totality. $121,100.00, 999 F.2d at 1507 (citing United States v. Socolow, 109 S.Ct. 1581, 1586 (1989)). But Stanford's ticket cost only $93; given the low dollar amount of this ticket, it hardly seems

---

population is considered a source city. United States v. Glover, 957 F.2d 1004, 1017 (2d Cir. 1992) (Oakes, C.J., dissenting) ("As cases too numerous to cite have pointed out, 'source cities,' as testified to by law enforcement officers, include virtually every city in the United States of any size. Any Lexis or Westlaw search would reveal that 'source cities' include every city with a population of over one million, most cities with over 500,000, and numerous cities with only over 100,000 inhabitants."). The more "travel between source cities" comes to mean just "travel," the less persuasive such travel becomes in the probable-cause analysis.

The persuasiveness of this factor is also somewhat degraded by the fact that Stanford lives near Miami and was returning home. We hesitate to say that every resident of South Florida has one strike against them for forfeiture purposes should they choose to travel and then to return home.

[18] We do not mean to imply that the government can obtain forfeiture by showing the claimant's acts deviated from some vague reasonable-business-person standard. Our standard is clear; the government must establish probable cause to believe that a substantial connection exists between the asset sought to be forfeited and an illegal drug transaction.

unusual that she paid cash.[19] Cf. Socolow, 109 S.Ct. at 1586 (paying $2,100 cash for two airline tickets from roll of $20 bills is out of the ordinary); see also $36,634.00, 103 F.3d at 1051 & 1055 n.9 (noting that a cash purchase of a $972 ticket has limited probative value). We also consider, but place little weight on, the fact that Stanford once "no showed" for her return flight and twice changed her return itinerary. While we accept the government's contention that large drug transactions may be delayed, we recognize -- as does the government -- that many travelers delay their flights for entirely legitimate reasons. We know of no circuit court that has said a changed itinerary is probative of a connection to drugs. The method Stanford used to pay for an inexpensive airline ticket and the alteration of her travel arrangements does little (if anything) to connect the money to an exchange of controlled substances.

When interviewed by the federal agents, Stanford could not name the people from whom she received the money and could not provide business receipts for the money. But as a practical matter, when one has the money, it is the other party to the transaction that would seem to need receipts. Stanford's inability or unwillingness to tell the agents precisely where she stayed in New York is

---

[19] In reviewing cases from other circuits, we have noticed that most cases do not indicate the cost of tickets purchased with cash. Of the cases that do, the costs are far greater then the cost of Stanford's ticket. The prices we have seen ranged from $443 to over $1,000.

somewhat bothering. We understand, however, that many people may be reluctant -- for reasons unconnected to drug crime -- to disclose where they spent certain nights in their lives or to surrender their privacy during a "voluntary" questioning session with the police. Not answering police questions in detail (a kind of evasiveness) can be circumstantial evidence of possible criminal (but not necessarily drug-related) activity and will be considered in our probable-cause inquiry. But in the totality of the circumstances of this case, we cannot say this circumstantial evidence can count for much toward establishing probable cause to believe that a substantial connection existed between the seized currency and a narcotics transaction.

We agree with the district court that "[t]he narcotics-detection dog's alert to the currency is also worth noting, although perhaps worth little else." The probative value of dog alerts to the smell of narcotics on currency has been called into question of late: most United States currency is suspected of having traces of narcotics.[20] By the way, even the government's own testimony in this case

---

[20] The district court indicated that the narcotics-detection dog's alert was not very significant. We look to precedent to determine *the weight* to give to the dog's alert. See United States v. $506,231.00, 125 F.3d 442, 453 (7th Cir. 1997) (refusing to take seriously the results of a dog alert because at least one-third -- or as much as 96% -- of currency in the United States is contaminated with cocaine) (citing cases and authorities); Muhammed v. Drug Enforcement Agency, Asset Forfeiture Unit, 92 F.3d 648, 653 (8th Cir. 1996) (concluding that a dog alert is "virtually meaningless" because "an extremely high percentage of all cash in circulation in America today is contaminated with drug-residue"); United States v. $5,000.00, 40 F.3d 846, 849-50 (6th Cir. 1994) (stating that the value of a dog alert is "minimal" because 70% to 97% of

indicated that perhaps as much as 80% of money in circulation may carry residue of narcotics.[21]  The district court did not find that Rambo would decline to alert to most circulated currency.[22]  Nor did the district court find that Rambo would only alert to currency recently in the proximity of drugs.  We accept that Rambo reacted to the smell of drugs.  But when perhaps as much as 80% of currency in circulation has drug residue on it, we are concerned that Rambo would have the same reaction to 80% of the circulated currency placed in front of him.  If so, the alert, as the district court determined, is of little value. [23]

Thus, the dog alert, at best, tells us that this currency (like most circulated currency) may have been exposed, at some point, to narcotics.  When combined with more compelling evidence of a connection to a narcotics transaction, this kind

---

currency in the United States is "so thoroughly corrupted" with cocaine contamination) (citing cases and authorities).

[21] As a side note, it seems a bit ironic that, the day after the seizure, the DEA exchanged this drug-tainted currency for a cashier's check at SunTrust Bank, where the currency was, possibly, placed back into circulation for innocent people to possess.

[22] We note that what the district court did not find is as important as what the district court did find.  In a forfeiture case, we remember that the government bears the burden of establishing probable cause. $4,255,625.39, 762 F.2d at 903.

[23] For an example of a dog alert that, we believe, is much more probative than the one in this case, see United States v. $22,474.00, 246 F.3d 1212, 1216 (9th Cir. 2001).  In $22,474.00, the government's evidence established that "the dog would not alert to cocaine residue found on currency in general circulation." Id.  The government's undisputed evidence also established that "unless the currency . . . had recently been in the proximity of cocaine, the detection dog would not have alerted to it." Id.

of dog alert may be probative; but it adds little in this case.

In addition, we observe some other circumstances of significance. First, the district court made no finding that Stanford or her brother had ever been charged with, implicated in, detained or investigated in association with a drug crime.[24] Nor did the district court find evidence of a specific drug transaction with which the currency is associated. We are aware of only one forfeiture appeal in this Circuit that upholds probable cause where no evidence specifically indicated that the claimant or someone closely associated with the claimant was involved in drug transactions: $4,255,625.39.[25] As explained later, $4,255,625.39 presents a much

---

[24] The present case is not a criminal case. While the NADDIS report indicated that some business called Mike's might be involved in money laundering, the report had so little reliability that the district court gave it no credence.

[25] Although we know that probable cause for a forfeiture can be established even if there is no direct evidence of some kind of drug activity, we also recognize that this result is rare. We are aware of only a few published circuit court opinions that conclude probable cause exists when direct evidence of drug crime is missing: $4,255,625.39, 762 F.2d 895 (11th Cir. 1985) (discussed infra); United States v. $42,500.00, 283 F.3d 977 (9th Cir. 2002); United States v. $141,770.00, 157 F.3d 600 (8th Cir. 1998); and $129,727.00, 129 F.3d 486 (9th 1997). We believe these cases present more compelling facts for forfeiture than this one. In $42,500.00, the claimant -- who said she was claiming as bailee but refused to provide contact information for the supposed bailor -- admitted to being a currency courier and told law enforcement officers that she was just carrying the bag with an amount unknown to her with instructions to deliver it to "Jose." 283 F.3d at 980. In $141,770.00, the money was wrapped in dryer sheets, triple bagged in resealable bags, and hidden in the ceiling panel of a vehicle; and the claimants lied to law enforcement officers about having money. 157 F.3d at 602-03. In $129,727.00, the currency was wrapped in dryer sheets and plastic wrap; also, the claimant lied about the amount of money he was carrying. 129 F.3d at 488.

Despite these cases, the government actually claims that probable cause is supported by the fact that Stanford has no prior association with drugs: that is, she seems so innocent. They claim that common sense says drug organizations will select couriers who have no drug history. A problem with this argument's strength is that we, and other circuit courts, have repeatedly said

22

more compelling case for forfeiture than is presented here.

Second, Stanford was traveling under her own name; she stated that she was carrying currency; and she told the agents how much currency she was carrying. These circumstances are unusual in drug/currency cases. Couriers commonly travel under false names. For background, see $121,100.00, 999 F.2d at 1507; United States v. $25,000.00, 853 F.2d 1501, 1507 (9th Cir. 1988); United States v. $5,644,540.00, 799 F.2d 1357, 1360 (9th Cir. 1986); United States v. $13,000.00, 733 F.2d 581, 585 (8th Cir. 1984), superseded by statute on other grounds in United States v. Trotter, 912 F.2d 964 (8th Cir. 1990); see also $67,220.00, 957 F.2d at 285 (traveling under own name reduces suspiciousness of travel). Couriers also commonly lie about the amount they are carrying. See id. at 286; see also United States v. $10,700.00, 258 F.3d 215, 232 (3d Cir. 2001) ("[I]t is significant that claimants did not lie about the amount of cash they possessed . . . and they immediately claimed ownership of the money after they voluntarily consented to the search of their bags. Both of those considerations weigh in claimants' favor in the probable cause calculus."). Stanford's traveling under her own name and her honesty about her possession of the currency and its amount go a long way to easing any suspiciousness raised by some evasiveness with the agents.

-- and the government has repeatedly argued in the past -- that a courier's history of involvement with drug crimes is a factor that supports a finding of probable cause.

Third, the district court found that Stanford is associated with a business, Mike's. But the district court did not find Mike's to be some sort of criminal enterprise. From the outset, Stanford, as a business person, had, and has, a plausible explanation for honestly having the cash.[26] Cf. United States v. $174,206.00, 320 F.3d 658, 662 (6th Cir. 2003) (affirming forfeiture where the owners had no legitimate source of income equal to the proceeds seized); United States v. Carrell, 252 F.3d 1193, 1201 (11th Cir. 2001) (concluding that government had shown probable cause for forfeiture where purchaser had no legitimate source of income); United States v. Parcels of Land, 903 F.2d 36, 40 (1st Cir. 1990) (affirming forfeiture where purchaser had no "apparent legitimate source of money to account for [the] magnitude of expenditures").

Courts exist largely to draw lines. When courts are called on to declare the legal consequences of a set of facts, the courts are called on to draw lines in which cases may be near each other but, still, on opposite sides.[27] In this forfeiture case,

---

[26] The district court found that Stanford is a shareholder and president of Mike's. The district court did not find that Mike's was an illegitimate business. The district court did not find that Mike's operations were insufficient to involve the amount of money Stanford carried with her.

[27] The district court thought that, on the facts, it was not obvious that probable cause had been met. During the hearing, the judge made this observation: "I think all those circumstances point towards the activity of the drug courier, certainly nowhere close to a reasonable-doubt standard, and I think it's frankly a close question, given those cases, as to whether there's a probable-cause standard. So that's why I think you all ought to really consider that case law and see if you can resolve it, but otherwise I think I'll try to write the best decision I can, and the

we have a business person, with no known criminal record, traveling to her Florida home under her own name openly on a public carrier, and forthrightly disclosing that she was carrying a large amount of cash. In support of probable cause for forfeiture, the government mainly points to some evasiveness with the agents, the large amount of currency, the fact that the currency was wrapped in black plastic and Christmas wrapping, the travel between source cities, the cash ticket, the changed itinerary, and the dog alert. We accept that collectively the elements relied upon by the government might point toward a *possible* connection to crime. But they only hint at crime: a suggestion well short of showing probable cause that a "substantial connection" exists between the funds at issue here and a narcotics transaction.

While the government's evidence might induce someone to suspect that a "substantial connection" to a crime exists, more than suspicion is necessary; and the connection must be to *drug* crime, not to crime in general. For a forfeiture, the government's evidence here is insufficient to cause a reasonably cautious person to believe -- to have some confidence, not just to imagine that it could be possible -- that the currency was substantially connected to a drug crime. Under the law, the

---

Eleventh Circuit will have to deal with it too." Then, later in his written order, he says again that the needed probable cause was "admittedly a close question."

We respect the district court's view, but in our judgment, the totality of circumstances is legally insufficient to support the conclusion of probable cause in this case.

25

totality of the circumstances found by the district court is not enough to justify the government's taking and keeping the money forever.

We believe we have looked at every published federal appellate decision discussing probable cause for forfeiture under section 881, and we are aware of no case concluding that the needed probable cause existed on a record like this one: a record this thin on facts connecting the pertinent property to an illegal drug transaction. The government seems to know of no such case either. At trial, when the district court asked for the best Eleventh Circuit case, the government cited Carrell. When we asked for the best case at oral argument, the government cited $67,220.00. Both cases present facts significantly more compelling than those presented here.[28]

The claimant in $67,200.00, Robert Easterly, lied to the government about the money he was carrying. $67,220.00, 957 F.2d at 286. He initially falsely told

---

[28] At one point at the district court hearing, the government lawyer cited United States v. $91,960.00, 897 F.2d 1457 (8th Cir. 1990), as a case finding probable cause "based on the same factors, less factors than we presented in this case." After hearing this representation, the district court commented "it's a little reckless to say less facts than are present in this case I think." In $91,960.00, the claimant, Luis Rosario, was traveling under a false name, gave three different stories about the source of the money he was carrying, had a notebook with his currency that the DEA agents testified appeared to contain notations of drug transactions, had a prior arrest for heroin possession which he lied to the agents about, and was subsequently arrested and convicted for marijuana distribution. Id. at 1459-60. Also in $91,960.00, the Eighth Circuit applied a clearly erroneous standard of review to the district court's finding of probable cause, id. at 1462, while our precedent dictates a de novo standard, see $121,100.00, 999 F.2d at 1507. This case is nothing like $91,960.00.

26

the government that he was carrying "about five thousand dollars," and he later falsely said he was carrying "about $20,000." Id. at 282. He falsely told the government that the money had come from his business and asked his boss to lie to the investigators and "vouch that the seized cash was Budget Gold's money so that Easterly could get it back." Id. at 282-83. Here, the factual findings indicate that Stanford has not engaged in this kind of deception. She did not deny that she was carrying cash; and her statements about the amount of cash were a close and reasonable approximation of the actual dollar amount. No evidence suggests that she asked anyone to lie for her. This case is not comparable to $67,220.00.

This case is not comparable to Carrell either. In Carrell, the government was able to trace the forfeited property directly to the proceeds of illegal drug sales. Carrell, 252 F.3d at 1201.

> [T]he government demonstrated probable cause that the first property titled in Scottie Carrell's name was purchased with the proceeds of Homer Carrell's marijuana and cocaine sales because he had no other legitimate source of income. Regarding the second property, the government's investigation revealed that the sixteen cars that belonged to Homer Carrell's mother that were exchanged for the property were purchased with Homer Carrell's drug proceeds.

27

Id. The court, in <u>Carrell</u>, concluded there was "ample evidence" of a substantial connection between the forfeited property and the marijuana and cocaine sales of Homer Carrell. <u>Id.</u> at 1202. In this case, no facts directly connect Stanford's money to illegal drug transactions. While this lack of a direct connection does not necessarily mean forfeiture is inappropriate, it does mean that <u>Carrell</u> is not instructive.

We suppose that our closest cases finding probable cause are <u>$121,100.00</u>, and <u>$4,255,625.39</u>. The present case, however, is considerably weaker than either of those cases. <u>$121,100.00</u> involved a person with a history of narcotics convictions, traveling under a false name, who purchased an expensive ($600) airline ticket with cash, was carrying a large sum of money to which a dog alerted, and planned only a single-day trip. <u>$121,100.00</u>, 999 F.2d at 1505, 1507. The <u>$121,100.00</u> court indicated that the prior narcotics convictions were critical to its probable-cause determination. <u>Id.</u> at 1507. Stanford's case is somewhat similar; but she did not travel under a false name, she purchased an inexpensive airline ticket and, very important, no facts show that she had a history of involvement in drug transactions.

<u>$4,255,625.39</u> involved a much greater amount of money, over seven million dollars, and had a Colombia connection. <u>$4,255,625.39</u>, 762 F.2d at 902. Probable

28

cause, in $4,255,625.39, was based in part on an eight-month-long *series of transactions* involving over $242,000,000. Id. at 903. In addition to the amount of money, the $4,255,625.39 court pointed to nine elements supporting probable cause, only one of which is even arguably present here.[29] Id. Of the $4,255,625.39 elements that are not present here, we believe these are significant: (1) the money was delivered by Colombian couriers; (2) on at least one occasion, the cash was delivered in the trunk of a car equipped with a secret compartment that was abandoned when the couriers were followed; (3) the bank charged an unusually high service fee for the claimant's account; and (4) the claimant had requested an "unusual" loan from the bank in which the funds were deposited to protect the funds in the event they were subject to forfeiture. Id. In addition, the claimant had falsely described the source of the money to his employee. Id. at 900. Furthermore, the claimant, before the forfeiture proceedings started, had -- more than once -- told bank officials dealing with the money that "perhaps he was dealing with people who were . . . involved in the drug business." Id. at 899-900. In contrast, as far as the record shows, Stanford has never suggested to anyone, at any time, that this

[29] The only $4,255,625.39 element that is arguably present here is that "the cash consisted of small and medium denomination bills." $4,255,625.39, 762 F.2d at 903. A significant element that is lacking in Stanford's case is a connection to Colombia. The money in $4,255,625.39 was delivered by Colombian couriers, and the claimant was a Colombian citizen. Colombia is a notorious source of drugs and drug dealers to the United States. Nothing links either the money or Stanford or anyone else to Colombia in this case. We believe that these differences are significant.

29

money has any links to illegal drugs. We acknowledge that the present case involves elements, such as the dog alert, that were absent in $4,255,625.39. But, in our view, $4,255,625.39 was a much stronger case; and we cannot say that this precedent supports a finding of probable cause for forfeiture here.

If we were to determine probable cause existed on the facts of the present case, we would be significantly extending (not just following) the precedents. The government asks us, in essence, to redraw the probable-cause line for forfeiture beyond the borders of $121,100.00 and $4,255,625.39 so that the new borders contain this case. It asks us to redraw the line further than we -- or any other circuit court -- have drawn it. We are mindful of the precedent we would set if we upheld probable cause for forfeiture on this thin a record. Every resident of Miami-Dade County traveling with considerable cash back to their home by common carrier on a cheap cash ticket would have several strikes against them automatically, especially considering how much cash has traces of illegal drugs on it nowadays. The result would be to vest the executive branch of the government with tremendous discretionary power in dealing with people in South Florida when it comes to taking their property. We do not believe this approach was Congress's intent.[30] And we

---

[30] In 2000, Congress passed the Civil Asset Forfeiture Reform Act (CAFRA) and raised the government's burden to establish a forfeiture from probable cause to preponderance of the evidence. In passing the Act, Congress was concerned that the preexisting civil forfeiture procedures (the ones which govern this case) inadequately protected private property and

30

see no good reason to extend the precedents in this way.  We decline to do so.[31]

As Justice Holmes noted, "[i]t sometimes is difficult to fix boundary stones between the private right of property and the police power when, as in the case at bar, we know of few decisions that are very much in point."  Hudson County Water Co. v. McCarter, 28 S.Ct. 529, 531 (1908).  But as Justice Holmes also noted, "[n]either are we troubled by the question where to draw the line.  That is the question in pretty much everything worth arguing in the law."  Irwin v. Gavit, 45 S.Ct. 475, 476 (1925).

In this country, forfeitures are not favored.[32]  They "should be enforced only

---

allowed "numerous controversial seizures of property." See 146 Cong. Rec. S1759 (daily ed. Mar. 27, 2000) (statement of Sen. Hatch).  We understand, of course, that pre-CAFRA law governs this appeal.  Nevertheless, we are especially reluctant to broaden the case law to enlarge the circumstances that make property subject to forfeiture under section 881(a)(6) against the background of a Congress that was attempting to narrow its scope.

[31] We are not the only circuit court to decline; we are aware of several cases presenting similar facts where other circuits have refused to allow a finding of probable cause.  See United States v. $10,700.00, 258 F.3d 215, 232 (3d Cir. 2001) (despite the fact that the claimants had prior drug convictions); United States v. $5,000.00, 40 F.3d 846, 848-49 (6th Cir. 1994) (despite one claimant having a prior drug use conviction); United States v. $30,060.00, 39 F.3d 1039, 1040-41 (9th Cir. 1994); United States v. $7,850.00, 7 F.3d 1355, 1358-59 (8th Cir. 1993); United States v. $53,082.00, 985 F.2d 245, 247-48 (6th Cir. 1993).
        For further support for no probable cause in this case, see United States v. Twenty Cashier's Checks, 897 F.2d 1567, 1568-70 (11th Cir. 1990), and the discussion of it in United States v. Four Parcels of Real Property, 941 F.2d 1428, 1442 n.30 (11th Cir. 1991) (en banc).

[32] We are talking about the taking of property forever by the government without the government paying any compensation.  We recall the nation's history. "Liberty, property, and no stamps! It had been the first slogan of the American Revolution."  C. Bowen, Miracle at Philadelphia: The Story of the Constitutional Convention May to September 1787 at 70 (1966).

31

when within both the letter and the spirit of the law." <u>United States v. One 1936 Model Ford V-8 De Luxe Coach</u>, 59 S.Ct. 861, 865 (1939); <u>see also</u> <u>United States v. $38,000.00</u>, 816 F.2d 1538, 1547 (11th Cir. 1987) ("Forfeitures are not favored in the law; strict compliance with the letter of the law by those seeking forfeiture must be required."). Forfeiture, therefore, should be allowed only when the circumstances are definitely sufficient to establish probable cause to tie the pertinent property in a substantial way to an illegal drug transaction. Given the deficiencies -- even viewed collectively and with a practical eye -- of the elements presented, and the complete lack of evidence connecting the seized money directly to illegal narcotics, the government's case here falls short of the probable-cause line for a forfeiture.[33]

---

[33] We caution against drawing wider conclusions from our limited decision. We stress what we do not decide today: we do not decide that the circumstances pointed to by the government would be inadequate to support, for example, a search (with or without a warrant) or an arrest (with or without a warrant). Other cases are not before us; so, every word we have written must be read in the context of this forfeiture case.

We have stated before that the standard for probable cause for forfeiture is "the same standard used to determine the legality of arrests, searches, and seizures in criminal law." <u>United States v. Four Parcels of Real Property</u>, 941 F.2d 1428, 1440 (11th Cir. 1991) (en banc) (internal quotations and citations omitted). And we say that again today. Nevertheless, the quantum of evidence necessary to meet the probable-cause standard -- even when the probable-cause test is articulated in basically the same way -- might vary from one kind of case to another depending on what kind of government act the probable cause is to justify. For example, under the probable-cause test, the quantum of evidence necessary for the government to search your home is -- we suspect -- less than the quantum of evidence necessary for the government to take your home away from you forever.

For further background about the varying quantum of evidence to meet the probable-cause standard, consider the following cases. For searches generally, see <u>Michigan v. Tyler</u>, 98 S.Ct. 1942, 1948 (1978) (stating that "[t]he showing of probable cause necessary to secure a

<u>REVERSED</u> with instructions to enter judgment for Claimant.

warrant may vary with the object and intrusiveness of the search"); <u>Camara v. Municipal Court</u>, 87 S.Ct. 1727, 1735 (1967) (stating that "there can be no ready test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search [or seizure] entails"); <u>Berger v. New York</u>, 87 S.Ct. 1873, 1888 (1967) (Stewart, J., concurring) (stating that "[t]he standard of reasonableness embodied in the Fourth Amendment demands that the showing of justification match the degree of intrusion"); <u>Gooding v. United States</u>, 94 S.Ct. 1780, 1797-98 (1974) (Marshall, J., dissenting) ("It is by now established Fourth Amendment doctrine that increasingly severe standards of probable cause are necessary to justify increasingly intrusive searches. . . . In some situations . . . this principle requires a showing of additional justification for a search over and above the ordinary showing of probable cause.") (citations omitted); <u>United States v. Torres</u>, 751 F.2d 875, 882 (7th Cir. 1984) (stating that "[t]he usual way in which judges interpreting the Fourth Amendment take account of the fact that searches vary in the degree to which they invade personal privacy is by requiring a higher degree of probable cause (to believe that the search will yield incriminating evidence)"); <u>West Point-Pepperell, Inc. v. Donovan</u>, 689 F.2d 950, 958 (11th Cir. 1982) (finding that a lesser quantum of evidence for probable cause is required for administrative searches than for criminal searches).

For seizures generally, see <u>Mason v. Godinez,</u> 47 F.3d 852, 856 (7th Cir. 1995) (stating that "the amount of information the police are required to gather before establishing probable cause for an arrest is in inverse proportion to the gravity of the crime and the threat of its imminent repetition"); <u>State v. Klinker</u>, 537 P.2d 268, 277 (Wash. 1975) (noting, in a seizure case, that probable cause is "a measure of constitutional sufficiency which varies with the situation presented").

For with-warrant versus without-warrant searches and seizures, see <u>United States v. Ventresca</u>, 85 S.Ct. 741, 744 (1965) (stating that courts will accept a lesser quantum of evidence to support probable cause for a with-warrant search than for a without-warrant search); <u>Aguilar v. Texas</u>, 84 S.Ct. 1509, 1512 (1964), <u>abrogated on other grounds</u>, <u>Illinois v. Gates</u>, 103 S.Ct. 2317 (1983) (same); <u>United States v. Anderson</u>, 500 F.2d 1311, 1315 n.8 (5th Cir. 1974) (stating that "the standards applicable to the factual basis supporting probable cause for a warrantless arrest and search . . . may even be more stringent" than those applied to a search warrant); <u>United States v. Shomo</u>, 786 F.2d 981, 983 (10th Cir. 1986) (same); <u>State v. Fletcher</u>, 288 A.2d 92, 97 (Me. 1972) (noting that "more evidence is needed to justify an officer in making a search without a warrant than is required for finding probable cause for issuance of a search warrant"); <u>People v. Madden</u>, 471 P.2d 971, 974 (Ca. 1970) (same).

For preliminary hearings, see <u>Williams v. Kobel</u>, 789 F.2d 463, 469 (7th Cir. 1986) (stating that "the probable cause determination at the preliminary hearing is far more stringent . . . than the probable cause determination made [at an arrest]"); <u>Goldsmith v. United States</u>, 277 F.2d 335, 343 (D.C. Cir. 1960) (written by future Chief Justice Burger) (stating that "[t]he quantum of evidence necessary to sustain an arrest is not, in all circumstances, the same quantum necessary to make out probable cause for charging a person with a crime"); <u>Wisconsin v. DeSmidt</u>, 454 N.W. 2d 780, 785 (Wis. 1990) (noting that greater quantum of evidence is required to find probable cause for a bindover than for a warrant); <u>Myers v. Commonwealth</u>, 298 N.E.2d 819, 823 (Mass. 1973) (same).

ANDERSON, Circuit Judge, dissenting:

Respectfully, I dissent.  I conclude that the government did adduce sufficient evidence to satisfy the requisite probable cause standard, a reasonable ground for believing that the currency was substantially related to a drug crime.

The cumulative effect of the evidence, including the following evidence, persuades me that the currency was substantially related to illegal activity:

- Stanford was either unable or unwilling to disclose to the agents, during their extended discussion at the DEA office at the airport, the identity of the persons from whom she received more than $242,000 in cash.  One would ordinarily expect the president and owner of a legitimate business to know more about the persons with whom she was doing business than simply that they were "some people" from her home country; this is especially true in the circumstance of receiving more than $242,000 in cash.

- Stanford was either unable or unwilling to identify where she stayed during her visit of several days in New York, or with whom she stayed.

- The currency was not only concealed, which is not unusual if one is going to carry large quantities of cash on public transportation, but was also wrapped in a plastic cellophane-like material, giving rise to a reasonable inference that there was an effort to conceal any odor of drugs.

- Although traveling with large quantities of cash is not illegal, it is unusual as part of a legitimate business practice, but, on the other hand, is commonplace in illegal activities, especially drug activities.

- Similarly, large quantities of cash in small denominations, and not

34

bundled in the manner that banks use, is unusual in legitimate business practices, but commonplace in illegal activities, especially drug activities.

- Although the probative value of the dog alert is diminished for the reasons indicated by the majority, the dog alert nevertheless retains probative value as evidence of illegal drug activity.

- The agents interrogating Stanford perceived a change in her story as to the reason for her visit to New York. Initially, she told them that she was involved in a court case that caused her to go to New York. However, when the agents asked about the case, Agent Myles testified that she changed her story and said that she had gone to pick up the money for the business.[1]

- Finally, Stanford paid cash for her airline ticket, scheduled a short trip between New York and Miami, and delayed her return several times. Although I agree with the majority that these facts are consistent with perfectly legitimate activity, and therefore have diminished value, nevertheless these facts are consistent with well known patterns of drug activity, and retain some probative value.

While the foregoing evidence persuades me that the government adduced evidence satisfying the probable cause standard that the currency was related to illegal activities, I agree that it is a closer question as to whether the necessary

---

[1]     The majority suggests that, as an appellate court, we cannot consider that factor because the district court made no explicit finding with respect to the truth thereof. I doubt the validity of the majority's suggestion that an appellate court can consider only explicit findings of the district court. Moreover, the relevant fact for the probable cause determination is not the truth of the fact (i.e., whether Stanford in fact changed her story), but rather the reasonable perception of the agent. The perception of the agent was not disputed, and was noted by the district court. Finally, this factor has only marginal significance, and its absence would not alter my persuasion that the government established the requisite probable cause.

nexus to drug activity was established. Ultimately, however, I am persuaded that the government's evidence does establish a reasonable ground for believing that the currency was related to illegal drug activity. In my judgment, the cumulative effect of the following evidence is sufficient to satisfy that standard with respect to the drug nexus:

- The reasonable inference of an effort to mask a drug odor arising from the way in which the currency was wrapped in a cellophane-type material.

- Of course, the large quantity of cash in small denominations is a possibility in other illegal activities, but much more likely is evidence of illegal drug activity, especially in view of other circumstances, including the brief visit by a Miami resident to New York and the cellophane wrapping.

- The dog alert.

In order to establish the requisite probable cause, the government is not required to prove that the nexus to illegal drug activity is more likely than not. All that the government is required to prove is that there is a reasonable ground for believing that there is such a nexus to drugs. I believe that the government has satisfied the requisite standard.

Finally, I do not believe that the length of the consensual discussion in the DEA office at the airport converted the confrontation at any point into an illegal

arrest, in light of Stanford's consent and the evidence of illegal activity.

For the foregoing reasons, I respectfully dissent.