UNITED STATES of America,
Plaintiff,

v.

$159,880.00 IN U.S. CURRENCY,
MORE OR LESS,
Defendant,

Mohamad Mohsen Elmathil and Fahd
Ahmed Saleh, Claimants.

No. 1:03–CV–40034.

United States District Court,
S.D. Iowa,
Western Division.

Aug. 2, 2005.

Plaintiff was represented by Craig P. Gaumer, Assistant United States Attorney, Southern District of Iowa.

Claimants were represented by Richard M. Lustig, Birmingham, MI.

## ORDER ACCEPTING REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

GRITZNER, District Judge.

This matter was considered by Hon. Celeste Bremer as permitted by L.R. 72.1(g) and under authority of 28 U.S.C. § 636(b)(1)(B) for submission of a Report and Recommendation regarding disposition. Magistrate Judge Bremer filed a Report and Recommendation on June 3, 2005. Claimants filed objections to the Report and Recommendation on June 14, 2005, and the United States has had opportunity to respond to Claimants' objections. In reviewing a Report and Recommendation where objections have been filed,

> [a] judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate.

28 U.S.C. § 636(b)(1). The Court has made a de novo review, taking into special consideration Claimants' objections. Having done so, the Court accepts the Report and Recommendation of the Magistrate Judge.

While Plaintiff suggests the Court has the discretion to grant summary judgment based on the Claimants' failure to properly defend this action in the manner required by Local Rule 56.1, *see Lawyer v. City of Council Bluffs*, 361 F.3d 1099, 1104 (8th Cir.2004); *Northwest Bank & Trust Co. v. First Illinois Nat'l Bank*, 354 F.3d 721, 724 (8th Cir.2003), the Court declines to take this approach. The Court instead has reviewed the record before the Court, the Report and Recommendation filed by Judge Bremer, Claimants' objections to said Report and Recommendation, and Plaintiff's response to the filed objections.

Claimants' primary objection to the Report and Recommendation consists of their inability to depose Officer Bentley, the officer involved in seizure of Defendant Currency. Judge Bremer discusses this issue in the Report and Recommendation, and the Court finds her assessment sound and acceptable. In addition, as Plaintiff points out in its response to Claimants' objec-

tions, the admissions by Claimants on the record before the Court support the determinations reached in the Report and Recommendation. Furthermore, the Court finds the Report and Recommendation made no impermissible credibility determinations, did not overlook any documents in the record, and the Claimants' affidavit is insufficient to preclude summary judgment. Moreover, Claimants' repeated Fourth Amendment claims are rejected for the reasons stated in the Report and Recommendation. In fact, the Court finds that Claimants' objections do not alter or diminish the substantive determinations reached in the Report and Recommendation. In short, upon a review of the record as a whole, the Court finds the Report and Recommendation reasonable and directly in line with the Court's own determinations.

Accordingly, in adopting the Report and Recommendation, the Court hereby **grants** Plaintiff's Motion for Summary Judgment (Clerk's No. 30). The Court orders summary judgment be entered in favor of Plaintiff and finds Defendant Currency in the amount of $159,880.00 more or less is subject to forfeiture under 21 U.S.C. § 881(a)(6). To the extent that Claimants' arguments are construed as a request for a Rule 56(f) continuance, the Court finds that such a continuance should not be granted to allow Claimants to depose Officer Bentley. The Court further **denies** Plaintiff's Motions to Stay Discovery (Clerk's No. 31) and to Strike Amended Verified Notice of Claim to Seized Property (Clerk's No. 34) as moot and also **denies** Plaintiff's Motion to Strike (Clerk's No. 32) on its merits. Furthermore, the Court **denies** Claimants' Motion to Amend An-

swer to Complaint and to Supplement Pleadings by Filing Affirmative Defenses and Additional Language in Claim Originally Filed (Clerk's No. 38).

**IT IS SO ORDERED.**

## REPORT AND RECOMMENDATION

Before the Court are Plaintiff's Motions for Summary Judgment (Clerk's No. 30), to Stay Discovery (Clerk's No. 31), and to Strike (Clerk's No. 32), all filed October 29, 2004; and Plaintiff's Motion to Strike Amended Verified Notice of Claim to Seized Property (Clerk's No. 34), filed November 4, 2004. Also before the Court is Claimants' Motion to Amend Answer to Complaint and to Supplement Pleadings by Filing Affirmative Defenses and Additional Language in Claim Originally Filed (Clerk's No. 38), filed November 26, 2004. The parties have submitted resistances and, in some instances, replies to the motions.

Plaintiff, the United States, filed its Verified Complaint for Forfeiture in Rem on June 16, 2003, alleging that the property at issue, approximately $159,880 seized by the government during a traffic stop, was subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6)[1] of the Controlled Substances Act, in that an attempt was made, or a conspiracy entered, to use the funds to facilitate one or more drug-related crimes prohibited by 21 U.S.C. §§ 841(a)(1) (prohibited acts) and 846 (attempt and conspiracy). Claimants contest the forfeiture and seek return of the $159,880.

This case was referred to the undersigned on March 30, 2005, for a Report and Recommendation under 28 U.S.C.

---

**1.** Section 881(a)(6) of the Controlled Substances Act authorizes the forfeiture of (1) "[a]ll ... things of value furnished or intended to be furnished by any person in exchange for" illegal drugs, (2) "all proceeds traceable to such an exchange," and (3) "all moneys, negotiable instruments, and securities used or intended to be used to facilitate" a federal drug felony. 21 U.S.C. § 881(a)(6).

§ 636(b)(1)(B). These matters are fully submitted. After carefully considering the record, the Court finds and recommends as follows on the issues presented.

## BACKGROUND

The following facts either are undisputed or are viewed in the light most favorable to Claimants, the parties resisting the Motion for Summary Judgment.

On Sunday, December 29, 2002, at approximately 11 p.m., Iowa State Patrol Trooper Todd Bentley saw a Cadillac heading east through Iowa on U.S. Interstate 80. The trooper observed that the Cadillac was traveling unusually slow and had an improperly displayed Michigan rear license plate.[2]

Bentley pulled the Cadillac to the side of the highway. At the officer's request, the driver, Mohamad Mohsen Elmathil, a claimant in this case, gave Bentley his Michigan driver's license and proof of insurance. The insurance card referred to coverage for a Denali, not a Cadillac; Elmathil maintained that the Cadillac was also on the policy. Elmathil said that the Cadillac belonged to his roommate and that Elmathil had an ownership interest in the car, although it was titled in his roommate's name. Bentley showed Elmathil how the rear license plate was improperly displayed.

At Bentley's request, Elmathil sat down in the front passenger side of the patrol vehicle. Elmathil told Bentley that he was returning to Michigan after vacationing in Las Vegas. Elmathil stated that he visited casinos while in Las Vegas. When Bentley asked Elmathil where he stayed in Las Vegas, Elmathil paused a long time[3] before answering that he had stayed at the Monte Carlo Resort. He said he stayed there only two days, because the weather forecast was bad for the return trip, and he had only seven days off from work. Elmathil said he worked as a quality technician for an engineering company in Dearborn, Michigan, a Detroit suburb. Elmathil said he did not fly to Las Vegas, because he was short on time and buying plane tickets at the last minute cost too much. Bentley left Elmathil in his patrol car while he went to check the vehicle identification number for the Cadillac.

The trooper next questioned the man sitting in the Cadillac's front passenger seat. The man's Michigan driver's license identified him as Fahd Ahmed Saleh. Saleh, the other Claimant in this case, said he was returning home to Michigan after vacationing in Las Vegas for a week. Saleh said they had visited all the casinos in Las Vegas. He was unable to say where he had stayed in Las Vegas. Saleh said they had also visited a friend in Oakland, California, during the trip. He told Bentley that the Cadillac belonged to Elmathil.

The trooper returned to his patrol car with Saleh's driver's license and called in a request for law enforcement checks on the two men and the Cadillac. The Cadillac's registered owner was Abdusalam Mussed-M Jahaf. Bentley observed that Elmathil was becoming more nervous[4] as the stop progressed. Bentley returned to the Cadillac, gave Saleh his license, and asked if anyone else was in the car. Saleh at first

---

2. Claimants at first admitted the license plate was improperly displayed, but in their Final Second Amended Answer they denied this fact. (Final Second Am. Answer at ¶ 10.)

3. Although Claimants had previously admitted that Elmathil paused a long time before answering, in their Final Second Amended Answer they denied this fact. (Final Second Am. Answer at ¶ 25.)

4. Claimants had admitted that Elmathil became more nervous as the stop progressed, but in their Final Second Amended Answer they denied this fact. (Final Second Am. Answer at ¶ 44.)

denied that another person was in the car, but then said there was a third occupant.[5]

Bentley saw in the backseat a third male, who apparently had been sleeping. The man's Michigan driver's license listed his name as Feisal A–M Mosleh. The man first said they had been in Las Vegas, California, and then restated they had been in Las Vegas, Nevada, for seven days and Oakland for a day and a half. Bentley returned to his vehicle and requested a law enforcement check on Mosleh. While waiting for the results, Bentley asked Elmathil if they had gone anywhere other than Las Vegas, and Elmathil said they had no time to do anything else.

The parties dispute in what sequence Bentley questioned Saleh and Mosleh and gave Elmathil a written warning ticket for the improper display of the rear license plate. The government asserts, and Claimants deny, that Bentley questioned Saleh and Mosleh before giving Elmathil the warning ticket. The government points to its Request for Admissions, which states that Bentley issued Elmathil a warning ticket after the trooper initially questioned Saleh and Mosleh about their trip and initiated law enforcement records checks on their identification, and which Claimants did not deny. (Pl.'s App., Ex. A at 5–6.) In his affidavit filed November 26, 2004, Elmathil contradicts this admission when he states that when he "was first placed in the car, before the trooper left the vehicle to question passengers," he was given the warning ticket. (Elmathil Aff. at 2.) Both parties cite the transcript of the traffic stop prepared by Claimants' attorney and attached to his affidavit. (Lustig Aff., Ex. A (Clerk's No. 44).)

Claimants assert the transcript shows Bentley gave Elmathil the warning ticket before questioning Saleh and Mosleh. (*Id.*, Ex. A at 4.) The government contends the transcript indicates Bentley gave Elmathil the warning ticket after questioning Saleh and Mosleh. (*Id.*, Ex. A at 11.) The Court finds that Bentley issued Elmathil the warning ticket after questioning Saleh and Mosleh.

After the officer and Elmathil got out of the patrol car, the trooper asked Elmathil in a series of questions if he had in the car any illegal drugs, including marijuana, cocaine, heroin, or methamphetamine; any weapons; or any large amounts of money. Elmathil replied no to each question, looking away from Bentley each time he answered.[6]

When Bentley asked Elmathil for permission to search the Cadillac, Elmathil asked if the officer had a reason for the search other than just because of Elmathil's Arabian race. Bentley replied that Elmathil's nationality had nothing to do with his search request. Bentley presented a consent-to-search form to Elmathil, who declined to read the form and said the search was totally based on nationality. Bentley repeated that Elmathil's nationality had nothing to do with the search request.

Bentley again asked Elmathil if the Cadillac contained any illegal drugs or a large amount of money. Elmathil answered, "I don't have nothing in there." (Compl. at ¶ 70.) At approximately 11:36 p.m., Bentley told Elmathil he was being detained pending a canine search of the Cadillac, because he suspected the car contained drugs, weapons, or a large sum of money.

---

**5.** Claimants admitted this statement, but in their Final Second Amended Answer they disputed that Saleh at first denied that another person was in the car, but then said there was a third occupant. (Final Second Am. Answer at ¶ 46.)

**6.** Although Claimants admitted that Elmathil looked away from Bentley each time he answered, in their Final Second Amended Answer they denied this fact. (Final Second Am. Answer at ¶ 62.)

Elmathil again denied having such items in the vehicle [7] and repeated his objections to a search on the basis the search was prompted by his ethnic background. Bentley called in a request for a canine search.

At approximately 11:46 p.m., another Iowa State Patrol Officer arrived at the scene to assist Bentley. At approximately 12:00 a.m., Trooper John Hitchcock arrived with a trained narcotics dog, Kevin, to conduct a canine search. After searching the vehicle with the three men inside, Kevin alerted to the scent of narcotics on or about the Cadillac, and specifically in the rear seat area.[8]

After asking all three men to get out of the Cadillac, the officers handcuffed them and put Elmathil and Saleh in Bentley's patrol car, and Mosleh in another patrol car. The officers told the men they were not under arrest, but were being detained while a search of the Cadillac was conducted. In the car's trunk, the officers found a black duffel bag containing a plastic bag filled with United States currency held in 21 bundles by rubber bands.

The troopers took the Cadillac and its occupants to an Iowa State Patrol Post. On the way, Elmathil said the bag contained $160,000, which was legitimate and was in the Cadillac for legitimate reasons. At the patrol post, a controlled canine sniff of the currency produced a positive indication of narcotics odor on the currency.[9]

The officers determined the duffel bag contained approximately $159,990 [10] in U.S. currency, excluding a counterfeit $20 bill. Elmathil claimed $100,000 of the money, giving the following accounting: $10,000 was his from a settlement; $10,000 was from his savings; $10,000 was loaned to him by Kelley Brumley from Ypsilanty, Michigan; Arf Almadg of Dearborn had loaned him $25,000; Elmathil's father, living in Yemen, had loaned him $25,000; and $20,000 was loaned to him from his uncle, who lives in Dearborn. Elmathil said he intended to use the money to open a 7-Eleven or Coney Island business. He maintained he earned $37,000 annually.

Saleh told officers that he owned $60,000 of the money, which he got from working, equity from the sale of a house, and credit card loans. Saleh said the main source of his income came from his salary as a cook at Big Daddy's Parthenon,[11] a restaurant in West Bloomfield, Michigan. He said he annually earned $50,000 from his job as cook and $9,000 from rental properties, and he had $45,000 from an insurance settlement, with more still owed him. He said he was on sick leave from work fol-

7. Claimants admitted that Elmathil again denied having drugs, weapons, or a large amount of money in the Cadillac, but in their Final Second Amended Answer they denied this fact. (Final Second Am. Answer at ¶ 72.)

8. Claimants previously admitted that Kevin alerted to the scent of narcotics on or about the Cadillac, specifically in the rear seat area, but in their Final Second Amended Answer they denied this fact. (Final Second Am. Answer at ¶¶ 82–83.)

9. Even though Claimants admitted that the controlled canine sniff of the currency produced a positive indication to the odor of narcotics on the currency, Claimants denied this fact in their Final Second Amended Answer. (Final Second Am. Answer at ¶ 95.)

10. The amount $159,990 appears in various locations in the record, (Ver. Compl. Forfeiture in Rem at 11; Pl.'s App., Ex. A at 9; Pl.'s Brf. Supp. Mot. Summ. J. or Partial Summ. J. at 6), although the Complaint and caption state the amount at issue is $159,880, (Ver. Compl. Forfeiture in Rem at 1).

11. Plaintiff refers to the restaurant as Big Daddy's Barthnan, and Claimants do not dispute that is the restaurant's name. (Compl. at ¶ 104; Pl.'s Statement Mat. Facts at ¶ 103; Pl.'s App. at 11, ¶ 103; Final Second Am. Answer at ¶ 104.) "Barthnan," however, is apparently a typographic error; an internet search shows West Bloomfield has a restaurant called Big Daddy's Parthenon, but none named Big Daddy's Barthnan. *See* Google

lowing a car accident. Saleh said the money in the Cadillac was to buy a business—a party store or a Coney Island or Big Boy restaurant—in Las Vegas or anywhere in California. Neither Elmathil nor Saleh could identify by name the businesses they visited and considered buying.

Mosleh told officers he knew the car had money it, but he did not know the amount or location of the money, or to whom it belonged. He thought Elmathil owned the Cadillac. Mosleh said he was unfamiliar with Saleh and Elmathil. He said he was recently fired from his job as a security guard in the Detroit airport. Mosleh disclaimed any interest in the money.

As part of their investigation, the officers kept copies of documents discovered in the Cadillac during the traffic stop. Those documents not in English were translated, and Bentley reviewed the translated documents. Bentley stated in his affidavit that, based on his training and experience, he believed the documents included records of drug transactions and the exchange of drug money. (Bentley Aff. at 6, and Ex. A.)

The state officers notified the Drug Enforcement Administration of the seizure, and the DEA initiated asset forfeiture proceedings on approximately January 13, 2003.

## PROCEDURAL HISTORY

On November 24, 2003, Claimants filed their Answer. Claimants filed their First Amended Answer on February 2, 2004. In neither pleading did Claimants assert an affirmative defense. Claimants failed to respond to the government's Request for Admissions.

On August 5, 2004, Claimants filed a Motion to Amend Answer (Clerk's No. 17).

In their Motion, Claimants stated that they had been out of the country for approximately six months, and their counsel was unable to get certain responses from them to raise affirmative defenses; they indicated they wanted to assert affirmative defenses. Claimants attached to their Motion the proposed Second Amended Answer, which, however, asserted no affirmative defenses.

By August 25, 2004, Plaintiff had filed no resistance to Claimants' Motion to Amend, and the Court granted the Motion. On August 27, Plaintiff filed an Objection to the Motion to Amend (Clerk's No. 24), and the government asked for a hearing. The Court treated Plaintiff's Objection as a motion to reconsider the Court's August 25 ruling. The Court held a hearing on September 9 and reviewed discovery materials recently provided by Claimants. In an order filed September 14, the Court granted Claimants leave to amend their Answer and ordered them to file an Amended Answer by October 15, 2004. Trial was set for May 23, 2005. Plaintiff did not ask the Court to reconsider its Order.

On October 13, 2004, Claimants filed a Final Second Amended Answer (Clerk's No. 28), which differed from the proposed Second Amended Answer by including affirmative defenses and by giving different answers to some allegations in the Complaint.

## ANALYSIS

**I. Plaintiff's Motion to Strike Final Second Amended Answer, Clerk's No. 32**

■ Plaintiff asks the Court to strike the Final Second Amended Answer under

Search: big daddy's parthenon near West Bloomfield, Michigan, http://www.google.com/local?hl= en & lr= & q=big+dad-

dy's+parthenon & near =West+Bloomfield'+Michigan & btnG=Search & sc=1 & rl=1 (last visited June 1, 2005).

Federal Rule of Civil Procedure 12(f) and Local Rule 15.1, because Claimants acted in bad faith and prejudiced Plaintiff when, instead of filing the proposed Second Amended Answer attached to the Motion to Amend Answer (Clerk's No. 17), they filed instead a different answer, the Final Second Amended Answer, without first providing a proposed Final Second Amended Answer. Unlike the proposed Second Amended Answer, the Final Second Amended Answer asserted affirmative defenses and denied certain facts alleged in the Complaint and not previously denied.

After holding the hearing on September 9, 2004, and reviewing discovery materials, the Court chose to order Claimants to file an Amended Answer by October 15 rather than again granting them leave to file the proposed Second Amended Answer. In compliance with the order, Claimants filed the Final Second Amended Answer on October 13. For reasons discussed in this Order, the affirmative defenses and denial of facts asserted in the Final Second Amended Answer have not prejudiced the government for purposes of its Motion for Summary Judgment. The Court finds that the Final Second Amended Answer should not be stricken under Federal Rule of Federal Procedure 12(f) or Local Rule 15.1.

The Court respectfully recommends that Plaintiff's Motion to Strike (Clerk's No. 32) be denied.

## II. Claimants' Motion to Amend Answer to Complaint and to Supplement Pleadings by Filing Affirmative Defenses and Additional Language in Claim Originally Filed, Clerk's No. 38

### A. Amend Answer

■ Claimants again seek to amend and supplement their Answer under Federal Rule of Civil Procedure 15(d) based on additional discovery material produced by Plaintiff.

■ Rule 15(a) provides that leave to amend a pleading "shall be freely given when justice so requires." *Doe v. Cassel*, 403 F.3d 986, 990 (8th Cir.2005). However, there is no absolute right to amend, and a finding of "undue delay, bad faith, or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the non-moving party, or futility of the amendment" may be grounds to deny a motion to amend. *Id.* (citing *Becker v. University of Neb. at Omaha*, 191 F.3d 904, 908 (8th Cir.1999)).

As Plaintiff points out in its resistance, Claimants did not attach a proposed amendment to their Motion, as required under Local Rule 15.1. Claimants have not specifically shown what the additional discovery material states and how such material would alter their answer. Claimants have already amended their Answer three times.

It is respectfully recommended that the Court deny Claimants' Motion with respect to the request to amend their Answer, including filing affirmative defenses.

### B. Additional Language in Claim

Based on the recommendation below on Plaintiff's Motion for Summary Judgment, it is respectfully recommended that the Court deny as moot Claimants' Motion to add additional language to their claim originally filed.

## III. Plaintiff's Motion for Summary Judgment, Clerk's No. 30

### A. Standard for Summary Judgment

A court shall grant a motion for summary judgment only if the record shows

that no genuine issues of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In ruling on a motion for summary judgment, a court must draw all justifiable inferences in the nonmoving party's favor. *Hunt v. Cromartie,* 526 U.S. 541, 552, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999).

The moving party bears the initial burden of proving that the case lacks a genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. The nonmoving party must then show sufficient evidence to establish every essential element of the party's case, and on which the party will bear the burden of proof at trial. Fed. R.Civ.P. 56(e); *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548.

**B. Continuance under Rule 56(f)**

■ Claimants first contend that they contest "many of the facts" and inferences set forth in Bentley's affidavit, but to adequately rebut "certain facts," they need to depose Bentley. (Brf. Res. Mot. Summ. J., at 2–3.) Claimants further argue they have been unable to depose the trooper, because the government has not cooperated with their request to provide his address or a time and place for the deposition.

■ When opposing summary judgment, parties who believe they have had an inadequate opportunity to conduct discovery must seek relief under Rule 56(f) of the Federal Rules of Civil Procedure. *Stanback v. Best Diversified Prod., Inc.,* 180 F.3d 903, 911 (8th Cir.1999). Rule 56(f) allows parties to seek a continuance and postponement of a summary judgment decision "until adequate discovery has been completed." *Dulany v. Carnahan,* 132 F.3d 1234, 1238 (8th Cir.1997).

■ When seeking such a continuance, a party must file an affidavit "showing what specific facts further discovery might unveil." *Stanback,* 180 F.3d at 911 (quoting *Dulany,* 132 F.3d at 1238); *see* Rule 56(f). A party's "conclusory statement that some useful evidence could possibly be found is insufficient" to obtain a Rule 56(f) continuance. *National Bank of Commerce v. Dow Chem. Co.,* 165 F.3d 602, 606 (8th Cir.1999); *see Dulany,* 132 F.3d at 1238 (holding the district court did not abuse its discretion in granting summary judgment before the non-movants had conducted the discovery they sought to "discover critical facts," when the non-movants failed to articulate "what particular critical facts they needed to develop or hoped to unveil").

Here, Claimants have not specifically sought relief under Rule 56(f) or filed an affidavit "showing what specific facts further discovery might unveil." *Stanback,* 180 F.3d at 911. Plaintiff provided Claimants the video and transcript of the traffic stop by Bentley. Claimants were themselves present during the stop. Claimants have not, in resisting either the Motion for Summary Judgment or the Motion to Stay Discovery, articulated what "particular critical facts" they need to develop or hope to unveil by deposing Bentley. *See Dulany,* 132 F.3d at 1238. Claimants merely provided conclusory statements that some useful evidence could possibly be found to rebut "certain facts." (Brf. Res. Mot. Summ. J., at 2.)

Accordingly, the Court respectfully recommends that a Rule 56(f) continuance not be granted to allow Claimants to depose Bentley.

**C. Establishing Claim under CAFRA**

The Civil Asset Forfeiture Reform Act of 2000 (CAFRA), 18 U.S.C. § 983, gov-

erns the government's claim. In a civil forfeiture action, an *in rem* proceeding against defendant property, the government as plaintiff asserts that, "[a]ll right, title, and interest in [the defendant] property" vests in "the United States upon commission of the act giving rise to forfeiture." 18 U.S.C. § 981(f); *United States v. Dodge Caravan Grand SE/Sport Van, VIN # 1B4GP44G2YB7884560*, 387 F.3d 758, 760 (8th Cir.2004).

### 1. Applicable Standard

Here, the government contends that an attempt was made, or a conspiracy entered, to furnish the defendant money in exchange for a controlled substance, or in an effort to facilitate one or more drug-related crimes prohibited under federal law. The government asserts, and Claimants dispute, that it is entitled to summary judgment, because no genuine issues of material fact are at issue and as a matter of law the government has established probable cause to connect the currency at issue to violation of federal drug laws.[12]

As an initial matter, the Court notes the parties are incorrect in maintaining that the government bears the burden of establishing probable cause to connect the currency at issue to drug trafficking. The probable-cause standard governs only cases arising before August 23, 2000, the effective date of CAFRA. *See United States v. $242,484.00*, 389 F.3d 1149, 1151, 1159 (11th Cir.2004) (stating that after August 23, 2000, probable cause "is no longer a central issue in forfeiture proceedings"); *cf. United States v. Melrose East Subdivision*, 357 F.3d 493, 505 n. 14 (5th Cir.2004) (noting that in pre-CAFRA forfeiture cases, "probable cause was the ultimate showing necessary for the government to prevail in a civil forfeiture action"); *compare United States v. Premises Known as 7725 Unity Ave. N., Brooklyn Park, Minn.*, 294 F.3d 954, 958 (8th Cir.2002) (stating, in civil forfeiture case that arose before August 23, 2000, that the government was entitled to summary judgment if it presented unrebutted evidence of probable cause), *with United States v. $84,615 in U.S. Currency*, 379 F.3d 496, 501 (8th Cir.2004) (applying CAFRA's standards to forfeiture action brought under 21 U.S.C. § 881(a)(6), when case arose after August 23, 2000). Because the current case arose after August 23, 2000, the Court will construe the parties' arguments as a dispute over whether any genuine issues of material fact remain and whether, as a matter of law, the government is entitled to summary judgment under CAFRA's standard.

For a suit or action brought under any civil forfeiture act, CAFRA places the initial burden on the government to prove by a preponderance of the evidence that the defendant property is subject to forfeiture. 18 U.S.C. § 983(c)(1); *United States v.*

---

12. In a letter to the Court dated August 23, 2005, asking the Court to publish its Report and Recommendation, the United States requested the Court amend the portion of its Report stating that the government had argued it satisfied the probable-cause standard; the government contends it identified the applicable burden of proof as the preponderance-of-the-evidence standard, rather than the probable-cause standard. The Court has reviewed the United States' brief in support of its summary judgment motion, and notes that although the government asserted the proba-

ble-cause standard in one portion of its brief ("The evidence concerning the Claimants' 'suspicious' and nervous behavior during the traffic stop can be considered in determining whether the government had probable cause to forfeit the currency." (Brf. Supp. Mot. Summ. J. or Partial Summ. J. at 19.)) it asserted the preponderance-of-the-evidence standard in more than one part of its brief. *See, e.g., id.* at 10–11, 20. Claimants cited both standards in their brief. *Compare* Brf. Res. Mot. Summ. J. at 3, with *id.* at 5.

*$174,206.00 in U.S. Currency,* 320 F.3d 658, 662 (6th Cir.2003). CAFRA requires the government to "establish that there was a substantial connection between the property" and the asserted offense. 18 U.S.C. § 983(c)(3); *cf. Dodge Caravan Grand SE/Sport Van, VIN # 1B4GP44G2YB7884560,* 387 F.3d at 761 (applying CAFRA's standards to forfeiture action brought under 21 U.S.C. § 881(a)(4)) (citing *United States v. Premises Known as 3639–2nd St., N.E., Minneapolis, Minn.,* 869 F.2d 1093, 1098 (8th Cir.1989) (Arnold, Richard S., concurring)).

■ Plaintiff can use circumstantial evidence to show that the defendant money is substantially connected to the asserted drug-related crime. *Dodge Caravan Grand SE/Sport Van, VIN # 1B4GP44G2YB7884560,* 387 F.3d at 761; *$84,615 in U.S. Currency,* 379 F.3d at 501. A lower degree of reliability of evidence does not foreclose its use, but instead "only makes necessary a greater amount of other reliable information to establish" the required connection to drug activity. *$242,484.00,* 389 F.3d at 1166 (citing *United States v. Armstead,* 112 F.3d 320, 322 n. 3 (8th Cir.1997)) (citing *Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990)).

■ To meet its burden under CAFRA, the government may use evidence it gathered after filing the Complaint. 18 U.S.C. § 983(c)(2). The same factors analyzed under the probable-cause standard are relevant to the preponderance-of-the-evidence determination. *See $174,206.00 in U.S. Currency,* 320 F.3d at 662.

■ If the government meets its burden of proof, it will prevail on its motion for summary judgment, unless the claimants introduce evidence sufficient to support their case. *United States v. Funds in Amount of Thirty Thousand Six Hundred*

*Seventy Dollars,* 403 F.3d 448, 463 (7th Cir.2005) ("It is axiomatic, however, that . . . the party opposing summary judgment had the burden of coming forward with properly supported arguments or specific evidence to show a genuine issue of material fact"); *$174, 206.00 in U.S. Currency,* 320 F.3d at 662 (affirming district court's grant of summary judgment, when the government met its burden but the claimants did not offer any evidence indicating innocent ownership or rebutting the government's evidence).

## 2. Establishing Connection to a Drug-related Activity

### a. Large Amount of Bundled Cash Stored in Plastic

As evidence of the required connection, Plaintiff points to several factors. Among the factors, Plaintiff notes that Claimants had in the Cadillac a large amount of cash, $159,880, divided into 21 bundles wrapped in rubber bands and stored in a plastic bag inside a duffel bag in the trunk.

Claimants counter that the large amount of cash does not, in and of itself, show that the money is substantially connected to a drug-related crime. Claimants argue that the view that carrying cash indicates illegal conduct "reflects class and cultural biases," and "[m]any immigrants and Americans with limited means—hard working and law abiding—prefer to use . . . cash in lieu of bank accounts and credit cards." (Brf. Res. Mot. Summ. J. at 17.) In support, Claimants cite an article discussing Hispanics' practice of paying with cash. Hispanics' practices, however, are irrelevant here. In addition, Claimants' argument does not account for the difference in carrying $159,880 in cash to buy a business, and paying cash for smaller purchases such as groceries and clothes, or even furniture and cars.

■ Possession of a large amount of cash is "strong evidence" that the cash is connected with drug activity. *$84,615 in U.S. Currency,* 379 F.3d at 501–02; *accord v. Funds in Amount of Thirty Thousand Six Hundred Seventy Dollars,* 403 F.3d at 467 ("Carrying a large sum of cash is 'strong evidence' of [a connection to illegal drug activity] even without the presence of drugs or drug paraphernalia.") (quoting *United States v. One Lot of U.S. Currency ($36,634),* 103 F.3d 1048, 1055 (1st Cir. 1997)); *United States v. $39,873.00,* 80 F.3d 317, 319 (8th Cir.1996). In this case, furthermore, the record contains additional circumstantial evidence.

Rather than obtain cashier's checks or converting smaller denomination bills into larger ones, Claimants rubber-banded the cash into 21 bundles and put it into a plastic bag placed inside a duffel bag. The Court finds this method of transporting funds provides further evidence that the cash was connected with drug activity. *See $242,484.00,* 389 F.3d at 1161 (noting that those who deal in drug-tainted money cannot convert large numbers of bills of various denominations into higher denomination bills, or into a cashier's check, without generating a currency transaction report; drug-enforcement agent testified that rubber-banded money was a factor he looked for; wrapping cash in cellophane-type material was a technique used by drug dealers to prevent discovery by drug-sniffing dogs); *$84,615 in U.S. Currency,* 379 F.3d at 502 (concluding the district court did not err in finding that the government met its burden of showing a substantial connection between claimant's property and drug trafficking by a preponderance of the evidence, when claimant transported the bulk of the money in vacuum-sealed bags, "a common ploy to mask odors such as might be detected by dog searches"); *United States v. Currency, U.S. $42,500.00,* 283 F.3d 977, 982 (9th Cir.2002) (stating cellophane is commonly used to conceal the smell of drugs from drug-sniffing dogs).

### b. Evidence of Concealment

Plaintiff next asserts as circumstantial evidence the fact that Elmathil lied to Bentley when the trooper asked if there was a large amount of cash in the car, and after the money was discovered, Elmathil tried to explain the money's presence.

■ The government may use evidence of concealment to help meet its burden of showing by a preponderance of the evidence a substantial connection between the property at issue and drug trafficking. *See $84,615 in U.S. Currency,* 379 F.3d at 502 (holding in civil forfeiture proceeding that claimants' behavior undermined the credibility of his assertions of legitimate reasons for possessing money, when, during a traffic stop, the claimant tried to conceal the money's presence by falsifying to the officer his ability to open the trunk, but later, when discovery of the money was imminent, the claimant tried to explain the money's presence).

### c. Recognized Source City/Route

Plaintiff next points to evidence that Claimants were transporting the funds between Nevada/California and Detroit, areas noted for their involvement in significant drug trafficking.

Claimants do not dispute that Nevada/California and Detroit are noted for drug-trafficking activity, but Claimants argue that the fact they were traveling between these areas is not a factor the Court should consider in its analysis. In support, Claimants point to *United States v. $242,484.00,* 351 F.3d 499 (11th Cir.2003), *opinion vacated by* 357 F.3d 1225 (11th Cir.2004), in which the court stated that while travel from New York to Miami, was an appropriate element to consider for for-

feiture purposes, the increase in the number of "source cities" makes travel between such cities, less persuasive. *Id.* at 509, n. 17.

Several courts, including the Eighth Circuit, consider evidence of travel between areas noted for drug-trafficking activity. *See, e.g., Funds in the Amount Thirty Thousand Six Hundred Seventy Dollars,* 403 F.3d at 467 (noting that airline passenger was traveling to Phoenix, a recognized source-city for illegal narcotics); *United States v. Fuse,* 391 F.3d 924, 929 (8th Cir.2005) (concluding trooper had reasonable suspicion of illegal activity sufficient to extend traffic stop, when among other circumstances, the defendant and his passenger were traveling from California, a "source state" for illegal narcotics); *$242,484.00,* 389 F.3d at 1162–63 (finding that route between New York and Miami was a factor weighing in favor of a probable-cause finding in forfeiture case; when asked on cross-examination to agree that people traveling between New York and Miami means nothing these days, agent said, "It means something if they are carrying a large amount of currency, yes"); *Currency, U.S. $42,500.00,* 283 F.3d at 981 (giving weight to fact that claimant was "traveling from New York to San Diego, well known source cities for drugs"); *United States v. $141,770.00 in U.S. Currency,* 157 F.3d 600, 604 (8th Cir.1998) (holding forfeiture of currency seized from a camper was supported by probable cause, despite claimant's assertion that money was derived from legitimate business activities, when among other circumstances, "the camper had originated in California, a drug source state, and was on its way back to California with a very large amount of cash after having spent time in the upper Midwest, a drug destination area"); *United States v. Carrate,* 122 F.3d 666, 669 (8th Cir.1997) (concluding troopers were justified in questioning defendant after issuing traffic citations; officers had a reasonable, articulable suspicion that defendant was involved in criminal activity unrelated to the traffic violation, when circumstances included fact defendant was in route from California, a point of origin for illegal drugs, to Chicago, a common destination for the shipment of illegal drugs); *United States v. White,* 42 F.3d 457, 460 (8th Cir.1994) (finding reasonable suspicion that vehicle was carrying contraband, when circumstances included fact that defendant was traveling from cities known to be sources for drugs); *United States v. Weaver,* 966 F.2d 391, 394 (8th Cir.1992) (finding reasonable suspicion for stop where, among other factors, defendant was on flight from known drug-source city, Los Angeles). California and Detroit are considered source cities. *See $242,484.00,* 351 F.3d at 509, n. 17.

Especially because Claimants were carrying a large amount of money, the Court finds that the fact that they were traveling from California to Detroit is an appropriate factor to consider. *See $242,484.00,* 389 F.3d at 1163.

#### d. Canine Alert to Currency

The government next asserts that a trained drug-detection dog alerted at the traffic stop and at the State Patrol Post to the scent of controlled substances on the currency, indicating that the money was connected to drug trafficking.

Claimants first argue that as a matter of law the drug dog's alerts provide insufficient evidence that the funds at issue were substantially connected to illegal drugs. Claimants contend that such alerts have no probative value, because an extremely high percent of all cash circulating in the United States contains drug residue. Claimants rely for support on cases from other jurisdictions, most filed in the early-to-mid 1990's, and on *Muhammed v. Drug En-*

*forcement Agency, Asset Forfeiture Unit,* 92 F.3d 648, 653 (8th Cir.1996) (stating that an "extremely high percentage of all cash in circulation in America is contaminated with drug-residue," and that the "fact of contamination alone is virtually meaningless and gives no hint of when or how the cash became to be so contaminated") (citing *United States v. $5,000,* 40 F.3d 846, 848–50 (6th Cir.1994)).

More recently, the Eighth Circuit and other circuit courts of appeal have found that positive alerts by drug dogs constitute evidence supporting the government's claim that certain funds were substantially connected to illegal drugs. *See Funds in the Amount of Thirty Thousand Six Hundred Seventy Dollars,* 403 F.3d at 460 (concluding that the information provided in the case indicated that dog alerts to currency should be entitled to probative weight, and concluding that drug dog's positive alert was entitled to probative weight); *$84,615 in U.S. Currency,* 379 F.3d at 502 (holding that evidence was sufficient to establish by a preponderance of the evidence a substantial connection between claimant's currency and drug trafficking; dog's alert to currency provided "some—albeit slight" indication that the money was related to drug trafficking); *$141,770.00 in U.S. Currency,* 157 F.3d at 604 (concluding that drug dog's alert to the seized money was circumstance supporting government's contention that currency at issue was substantially connected to illegal drugs; excluding testimony of expert who believed that 99 percent of United States currency was contaminated with some amount of drug residue).

Claimants next attack the reliability of the first alert by asserting that the presence of food in the Cadillac, not drug residue on the currency, precipitated the drug dog's alert during the traffic stop. Claimants do not challenge the dog's train-ing or the methodology used during the sniff search. Claimants' mere allegation is insufficient to create a genuine issue of material fact. Moreover, even if the food's presence interfered with the first alert, it did not impede the second drug-dog alert at the state patrol post.

Claimants have not provided sufficient evidence, including expert evidence, to negate the probative value of the drug alerts in this case, and the Court will consider the alerts along with the other circumstantial evidence.

### e. Inconsistencies

During the traffic stop, Claimants made inconsistent and false statements to Bentley about topics including whether claimants were carrying a large amount of money, their reasons for visiting Las Vegas, where they had stayed in Las Vegas, and whether they had visited locations other than Las Vegas. Claimants claimed to have been looking for a business to buy, but they could provide no proof of that alleged effort, including the name or location of any of the businesses they considered buying. Although Elmathil told Bentley he had stayed at the Monte Carlo resort while in Las Vegas, the resort's assistant controller, Leonard Tanchala stated in his affidavit, that the resort's business records contained no reference to any visits by Elmathil, Saleh or Mosleh during the period at issue.

These inconsistencies and contradictions are relevant in determining whether the government has met its burden in justifying forfeiture. *See Funds in Amount of Thirty Thousand Six Hundred Seventy Dollars,* 403 F.3d at 463 (stating that inconsistencies were relevant in weighing whether the government had established its burden justifying forfeiture, when claimant, who stayed in Phoenix at least 27 nights during the two months he had been traveling there, alleged that he stayed at

the same hotel each trip (at "55th and the expressway") but could not recall the hotel's name, and subpoenaed travel records indicated that Calhoun did not stay at any hotel at "55th and the expressway"; one reason Calhoun gave for the move was his desire to pursue a romance with "Rochelle," whose last name, phone number, and address he was unable to provide; and he claimed to have been searching for work in Phoenix but could provide no proof—not even the name of any of the prospective employers); *$242,484.00*, 389 F.3d at 1164 (finding it proper to consider claimant's inconsistent statements and changing stories in determining whether the government met its burden; holding in civil forfeiture action that government had probable cause to believe that substantial connection existed between cash and criminal activity, when it could be inferred from officer's undisputed testimony that person had changed her story about circumstances under which she had acquired cash); *United States v. $22,474.00 in U.S. Currency*, 246 F.3d 1212, 1216–17 (9th Cir. 2001) (finding claimant's inconsistent statements about the amount of money he was carrying, the origin of the money and his reasons for being in Phoenix supported an inference that the money was drug-related; claimant was unable to answer simple questions about his last job, the address of the person he claimed to be visiting, and the name or address of the dealership from which he intended to buy the Tahoe automobile, and both his wife and sister-in-law contradicted his proffered reasons for visiting Phoenix); *United States v. $67,220.00 in U.S. Currency*, 957 F.2d 280, 286 (6th Cir.1992) ("[M]isstatements are probative of possible criminal activity."); *United States v. $215,300 in U.S. Currency*, 882 F.2d 417, 419 (9th Cir.1989) (finding that attempts to avoid detection by concealing or lying about the money supported an inference that the money was

drug-related.); *cf. Armstead*, 112 F.3d at 322 (concluding that combined evidence supported a finding of probable cause to search the room, when the evidence included the defendant's curious explanation for his presence in the motel and defendant's inconsistent answers to the officer's questions; defendant told the officer that he was "kind of" traveling alone, but shortly thereafter stated that he was traveling alone, and a woman who had purchased a ticket and traveled with the defendant told the officer she was traveling with the defendant).

### e. Drug Records

As further evidence, the government has provided a translation of notes that the officers found in the Cadillac. (Bentley Aff., Ex. A.) The notes appeared to the officers to be a record of drug transactions. The Court finds the notes provide circumstantial evidence that the $159,880 was related to drug activity.

### f. Nervousness

The government also points to evidence that Bentley thought that the Claimants, especially Elmathil, seemed nervous for someone stopped for having an improperly displayed license plate.

 The fact that a defendant appeared nervous may constitute circumstantial evidence in combination with other evidence. *See United States v. Sokolow*, 490 U.S. 1, 8–9, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (holding that agents had a reasonable basis to suspect the defendant was transporting illegal drugs, when, in addition to other evidence, the defendant appeared nervous); *Fuse*, 391 F.3d at 929; *cf. United States v. Nunley*, 873 F.2d 182, 185 (8th Cir.1989) (finding that investigative stop was justified where, among other circumstances, the defendant had purchased a one-way airplane ticket with cash

a few minutes before departure and exhibited a "nervous state").

Whether a court considers a defendant's nervousness under police questioning as circumstantial evidence, may depend on the degree of nervousness and the circumstances of the questioning. *See Fuse,* 391 F.3d at 929 (concluding the extreme or unusual nervousness of the vehicle's driver and his passenger throughout the stop's duration, even after the trooper said he was issuing only a warning citation, along with other circumstances were enough to create a reasonable suspicion of illegal activity sufficient to extend the traffic stop to conduct a dog sniff; distinguishing *United States v. Beck,* 140 F.3d 1129 (8th Cir. 1998), where the circumstances, including the defendant's apparent nervousness, were insufficient to create reasonable articulable suspicion to support detention after the initial stop ended). *Compare Reid v. Georgia,* 448 U.S. 438, 441, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam) (holding that agent could not have reasonably suspected the petitioner of criminal activity on the basis of the observed circumstances, including the nervousness of the petitioner and the man he was with in the airport); and *United States v. White,* 890 F.2d 1413, 1418 (8th Cir.1989) (finding unpersuasive the factor that defendant became nervous while answering officers' questions in the airport, holding that officers who detained defendant in airport lacked an adequate basis to form a reasonable, articulable suspicion of ongoing or imminent criminal activity; expert testified that it was not unusual to find people who appeared to be nervous in airports; "becoming nervous when one is confronted by officers of the law is not an uncommon reaction"), *with Weaver,* 966 F.2d at 395 (concluding the officers had a reasonable, articulable suspicion that the defendant was engaged in criminal activity, when they pursued him to detain his baggage

after he tried to leave; defendant appeared to be very nervous; his voice was unsteady, his speech was rapid, his hands shook, and his body swayed; the officer testified that, although people often become nervous when a police officer approaches them, the defendant showed more nervousness than innocent people usually show).

Considering that he had stopped Claimants for having an improperly displayed license plate, Bentley thought that Claimants, especially Elmathil, were significantly more nervous under questioning than he would have expected. Under these circumstances, the Court concludes that the fact that Claimants appeared nervous is circumstantial evidence that may be considered in combination with other evidence.

### 3. Claimants' Additional Arguments

██ In addition to challenging the factors cited by the government, Claimants have pointed to additional factors that they contend preclude summary judgment. First, Claimants note they were never arrested or convicted in connection with the circumstances of this case, and neither Claimant has a criminal record. A criminal conviction, however, "is not a prerequisite to a civil forfeiture proceeding." *United States v. One Sharp Photocopier, Model SF–7750, Serial No. 86210469,* 771 F.Supp. 980, 983 (D.Minn.1991) (citing *United States v. All Right, Title & Interest in Real Property & Building Known as 303 West 116th Street, New York, New York,* 901 F.2d 288, 292 (2d Cir.1990) (holding that even if claimant's state conviction on drug charge were overturned; the conduct underlying the conviction established probable cause supporting forfeiture), *United States v. Dunn,* 802 F.2d 646, 647 (2d Cir.1986) (holding government could prosecute a civil forfeiture proceed-

ing, when prior criminal forfeiture proceeding had been unsuccessful), and *United States v. $152, 160.00 United States Currency,* 680 F.Supp. 354, 356 (D.Colo. 1988) ("a criminal conviction is not prerequisite to a civil forfeiture proceeding")).

■ Next, Claimants argue that once Bentley issued the traffic ticket to Elmathil, the trooper violated the Fourth Amendment by initiating questioning of Saleh and Mosleh, the passengers in the Cadillac. Claimants object to the inclusion of Saleh's and Mosleh's statements in Plaintiff's statement of facts.

Claimants' argument fails for two reasons. First, although Claimants now argue, based on statements in Elmathil's affidavit, that Bentley issued the traffic ticket to Elmathil before questioning Saleh and Mosleh, Claimants previously admitted that the trooper issued the citation after questioning the two passengers. Claimants offer no explanation for the discrepancy between their previous admissions and Elmathil's contradictory affidavit. Claimants cannot generate a genuine issue of material fact on this issue with an affidavit that contradicts their previous admissions. *See Knudsen v. United States of America,* 254 F.3d 747, 752 (8th Cir.2001); *Dotson v. Delta Consol. Indus.,* 251 F.3d 780, 781 (8th Cir.2001). As stated previously, based on Claimants' admission and the transcript of the traffic stop, the Court finds that Bentley gave Elmathil the warning ticket after questioning Saleh and Mosleh.

■ Second, Claimants have not shown that even if Bentley initiated questioning of the two men after issuing the traffic ticket, such further investigation violated the Fourth Amendment. The only case on which Claimants rely, *Knowles v. Iowa,* 525 U.S. 113, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998), is inapposite. In *Knowles,* a police officer who stopped a speeding driv-

er and issued a citation, rather than arresting the driver, had no authority to conduct a full search of the car without the driver's consent or probable cause to search. *Id.* at 114, 119, 119 S.Ct. 484 (declining to extend the "bright-line rule" giving police authority to conduct a full field search incident to an arrest).

■ A traffic violation, however minor, creates probable cause to stop the driver of a vehicle. *Fuse,* 391 F.3d at 927; *United States v. Ramos–Caraballo,* 375 F.3d 797, 800 (8th Cir.2004); *see Illinois v. Caballes,* —— U.S. ——, ——, 125 S.Ct. 834, 837, 160 L.Ed.2d 842 (2005); *United States v. Smart,* 393 F.3d 767, 770 (8th Cir.2005). However, a seizure that is lawful at its beginning, can become unlawful, if the manner of the seizure's execution unreasonably infringes an interest protected by the Constitution. *Caballes,* 125 S.Ct. at 837. A seizure justified solely by the interest in issuing a warning ticket to the driver can violate the Fourth Amendment if it is "prolonged beyond the time reasonably required to complete that mission." *Id.* (accepting state court's conclusion that the traffic stop's duration was justified by the traffic offense and the ordinary inquiries incident to such a stop).

■ However, after stopping a vehicle, an officer does not violate the Fourth Amendment "by asking the driver his destination and purpose, checking the license and registration, or requesting the driver to step over to the patrol car." *United States v. Linkous,* 285 F.3d 716, 719 (8th Cir.2002) (citing *United States v. Poulack,* 236 F.3d 932, 935 (8th Cir.2001)); *accord Smart,* 393 F.3d at 771. To verify the information given by the driver, the officer may "undertake similar questioning" of the passengers. *Linkous,* 285 F.3d at 719.

■ If, during a legitimate traffic stop, an officer has developed reasonable suspicion to believe criminal activity is afoot, the officer may then prolong the detention and expand the stop's scope. *See Fuse,* 391 F.3d at 928–29; *United States v. Allegree,* 175 F.3d 648, 650 (8th Cir.1999) (citing *United States v. Pereira–Munoz,* 59 F.3d 788, 791 (8th Cir.1995)).

Bentley's initial questioning of Saleh and Mosleh, was reasonable as part of the traffic stop. The traffic stop was lawful at its inception and was executed in a reasonable manner. The inconsistent and conflicting answers given by Elmathil, Saleh and Mosleh during the initial investigation reasonably aroused the troopers' suspicion and justified the further detention and expanded scope of the investigation.

■ The United States has met its burden under CAFRA to show by a preponderance of evidence that the currency at issue is substantially connected to the asserted drug offenses and is therefore subject to forfeiture under 21 U.S.C. § 881(a)(6). Claimants have failed to offer sufficient evidence to create a genuine issue of material fact contradicting the government's evidence that the money in the Cadillac was the proceeds of drug trafficking. Given the facts on the summary judgment record, the Court finds the $159,880 is subject to forfeiture under 21 U.S.C. § 881(a)(6), and the government is entitled to judgment as a matter of law. Therefore, the Court respectfully recommends granting summary judgment to the government.

## IV. Plaintiff's Motion to Stay Discovery, Clerk's No. 31

It is respectfully recommended that the Court deny Plaintiff's Motion to Stay Discovery, Clerk's No. 31, as moot.

## V. Plaintiff's Motion to Strike Amended Verified Notice of Claim, Clerk's No. 34

Based on the recommendation above on Plaintiff's Motion for Summary Judgment, the Court respectfully recommends that Plaintiff's Motion to Strike Verified Notice of Claim (Clerk's No. 34) be denied as moot.

## RECOMMENDATION AND ORDER

IT IS RESPECTFULLY RECOMMENDED, under 28 U.S.C. § 636(b)(1)(B), that, for the reasons discussed above, the following rulings be made on the pending motions:

Plaintiff's Motion for Summary Judgment (Clerk's No. 30) be granted. To the extent that Claimants' arguments are construed as a request for a Rule 56(f) continuance, the Court respectfully recommends that such a continuance not be granted to allow Claimants to depose Officer Bentley.

Plaintiff's Motions to Stay Discovery (Clerk's No. 31) and to Strike Amended Verified Notice of Claim to Seized Property (Clerk's No. 34) be denied as moot. Plaintiff's Motion to Strike (Clerk's No. 32) be denied.

Claimants' Motion to Amend Answer to Complaint and to Supplement Pleadings by Filing Affirmative Defenses and Additional Language in Claim Originally Filed (Clerk's No. 38) be denied.

■ IT IS ORDERED that the parties have until June 20, 2005, to file written objections to this Report and Recommendation, under 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. *Thompson v. Nix,* 897 F.2d 356, 357 (8th Cir.1990) (per curiam); *Halpin v. Shalala,* 999 F.2d 342, 345 & n. 1, 346 (8th Cir.1993). The Court will freely grant such extensions. *Martin v. Ellandson,* 122 F.Supp.2d 1017, 1025 (S.D.Iowa 2000).

Any objections filed must identify the specific portions of the Report and Recommendation and relevant portions of the record to which the objections are made and set forth the basis for such objections. *See* Fed.R.Civ.P. 72; *Thompson,* 897 F.2d at 357; *Martin,* 122 F.Supp.2d at 1025. Failure to timely file objections may constitute a waiver of a party's right to appeal questions of fact. *Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *United States v. Newton,* 259 F.3d 964, 966 (8th Cir.2001) (citing *Griffini v. Mitchell,* 31 F.3d 690, 692 (8th Cir. 1994)).

IT IS SO ORDERED.

June 3, 2005.